Hudson, Admrx., *v.* Grace (et al., Appellant).

Argued October 1, 1943. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON and STEARNE, JJ.

*John M. Reed,* for appellant.

*John E. Evans, Jr.,* with him *John E. Evans, Sr.,* of *Evans, Evans & Spinelli,* for appellees.

OPINION BY MR. JUSTICE HORACE STERN, November 22, 1943:

While no case is reported in Pennsylvania with the same factual situation as that which gave rise to the present litigation, there is not involved here the appli-

cation of any new doctrine in the law of negligence. Human life is so complex that the circumstances attending the happening of different accidents are correspondingly varied, but the principle which determines the imposition of liability is simple and constant, being based on the proposition that one who, by sub-standard conduct, causes injury to another is legally responsible therefor if the harmful consequences of such conduct could reasonably have been foreseen. When that principle is applied to the present facts, however unusual they may be, there can be no doubt of the liability of the Crucible Steel Company of America to plaintiffs in this action.

The Thirty-first Street Bridge, running in a north-westerly-southeasterly direction across the Allegheny River in Pittsburgh, intersects East Ohio Street at its northerly and Penn Avenue at its southerly end. As one travels south on the bridge the roadway bends toward the right at the point where it passes the southerly bank of the river, and from there descends on a rather steep incline to Penn Avenue. Below, close to each side of the line of the bridge, and extending between the river and the tracks of the Allegheny Valley Railroad, are the buildings of the Crucible Steel Company. One of these, on the westerly side, is the boiler house, from the roof of which project several safety-valve exhaust pipes, and also a 20-inch vent for the escape of the steam not utilized in the water heater. All these outlets are approximately on the level of the roadway. The 20-inch vent is situated at a distance of from 100 to 150 feet from the bridge, and from it there is said to emerge a constant stream of vapor during practically the entire time the plant is in operation.

Plaintiffs produced several witnesses—a worker in the neighborhood, a trucker, automobilists, and traffic policemen—who testified that, for at least several years previous to the accident, clouds of steam, in the nature of a heavy fog, would frequently sweep from the roof of

the boiler house directly across the roadway of the bridge at or near its bend when, as was usually the case, the wind was from the west. The steam would blow over and envelop passing automobiles, and destroy, or at least seriously impair, visibility. This condition must, or certainly should, have been known to the Crucible Steel Company, and, according to the testimony, could have been remedied either by increasing the height of the vent so that more of the steam would thereby be condensed and the rest, when it blew across the bridge, would do so above the tops of vehicles, or by installing a closed instead of a vented water heater; the expense involved in the first method would have been negligible, and in the other would allegedly have been neutralized by the economy effected in utilizing the energy of the escaping steam instead of wasting it.

Between five-thirty and six P.M., eastern war time, on March 9, 1942, an automobile driven by defendant Frank Grace, in which plaintiff Mary R. Lavelle and decedent Arthur F. Hudson were passengers, was traveling southward across the bridge, and, on reaching a point at or near the bend of the roadway above the southerly bank of the river, collided head-on with an automobile driven by defendant George A. Ficht, which was crossing the bridge from the south and approaching the top of the ramp. It was the left fronts of the vehicles which came in contact with one another. According to some of the witnesses, the Grace car was entirely on its right, or westerly, side of the road and the Ficht car had improperly come over there while engaged in passing another northbound car. According to Miss Lavelle, the Grace car had "missed the curve," that is, instead of following the roadway to the right had kept straight on and in that way gone slightly to its left of the white line marking the center of the roadway, and the Ficht car also had partly crossed to its left of that line. According to Ficht, his car approached close to, but never went over, the center line, but the Grace

car did. But whichever of these versions be the correct one, *all* of the witnesses to the accident agree that, immediately preceding the collision and as one of its principal causal factors, a cloud of steam swept across the roadway and enveloped the two cars. Grace and Miss Lavelle testified that, as their car approached the turn in the road, the steam—of course unexpectedly—blew across in front of and around them so that they could not see ahead at all, and when, after two or three seconds, the vapor lifted, the Ficht car was at too short a distance, only ten or fifteen feet, to enable either driver to avoid the collision. Ficht testified that the gust of steam came over his car and into its open window, steaming the windshield and his own glasses, and the crash followed in a couple of seconds. Other witnesses, entirely disinterested, likewise testified that just as the two cars neared one another at the curve the steam came across between them and the collision occurred almost instantly thereafter. Grace said that the steam came from the "exhaust pipe" on the roof of the boiler house (the 20-inch vent was admittedly the only one then emitting steam), and the testimony of the other witnesses placed its origin at approximately that point. As the visibility at the time and place of the accident was very good (three miles, according to the records of the United States Weather Bureau) except as impaired by the steam emitted from defendant's plant, and as there is no claim or intimation in the evidence that the driver of either car was inattentive, it is clear, as all the witnesses apparently agree, that but for that emission and the blowing of the vapor across the roadway of the bridge the accident would not have happened. The jury exonerated defendants Grace and Ficht,[1] and found verdicts only against additional defendant, Crucible Steel

---

[1] A compulsory nonsuit was entered in favor of another defendant, C. F. Sanguigni, trading as A. Sanguigni & Sons Company, the employer of Ficht, it being admitted that Ficht was not engaged on his employer's business at the time of the accident.

Company, one of $15,000 in favor of the administratrix of the estate of Arthur F. Hudson (who was killed in the accident), for the benefit of that estate, one of $13,000 in favor of the administratrix for her own benefit (she being Hudson's widow), and another of $17,000 in favor of Mary R. Lavelle, who suffered substantial injuries.

As already stated, there is no case in this jurisdiction close enough on its facts to serve as a guiding precedent, but there have been several decisions in the courts of other states imposing liability upon those responsible in cases in which persons were injured in automobile collisions caused by steam or smoke blown across the highway so as to impair the driver's vision.[2] The applicable legal principle is that one who is in possession of land adjacent or in close proximity to a public highway must exercise reasonable care to avoid injury to the traveling public arising from unnecessarily dangerous conditions created by him on the land, where the consequences of a failure to do so are reasonably foreseeable. "A possessor of land is subject to liability for bodily harm to others outside the land caused by an activity carried on by him thereon which he realizes or should realize as involving an unreasonable risk of bodily harm to them under the same conditions as though the activity were carried on at a neutral place": Restatement, Torts, section 371. The steam carried by the wind across the bridge from the roof of the boiler house was not a mere background of the accident, but

---

[2] *Oviatt v. Garretson*, 205 Ark. 792, 171 S. W. 2d 287; *Fisher v. Southern Pacific Co.*, 72 Cal. App. 649, 237 P. 787; *Bonner v. Standard Oil Co.*, 22 Ga. App. 532, 96 S. E. 573; *Southern Cotton Oil Co. v. Wallace*, 27 Ga. App. 415, 108 S. E. 624; *Farrer v. Southern Ry. Co.*, 45 Ga. App. 84, 163 S. E. 237; *Pitcairn v. Whiteside*, 109 Ind. App. 693, 34 N. E. 2d 943; *Smith v. Edison Electric Illuminating Co.*, 198 Mass. 330, 84 N. E. 434; *Keith v. Yazoo & Mississippi Valley R. R. Co.*, 168 Miss. 519, 151 So. 916; *Pisarke v. Wisconsin Tunnel & Construction Co.*, 174 Wis. 377, 183 N. W. 164; *Ryan v. First National Bank & Trust Co. of Racine*, 236 Wis. 226, 294 N. W. 832.

an active agency produced by the Crucible Steel Company which, by materially interfering with the vision of the operators of the two automobiles, was, if not the sole, at least a concurrent or contributing cause of the happening. The likelihood of such an occurrence was so obvious that it was negligence on the part of the Company to persist in the maintenance of a condition which constituted a more or less constant menace to human life. The situation is not similar to that of a railroad company whose locomotives unavoidably belch forth steam and smoke and whose trains cause noise and dust in the vicinity of its tracks (*Pennsylvania R.R. Co. v. Lippincott*, 116 Pa. 472, 9 A. 871; *Webb v. Philadelphia & Reading Ry. Co.*, 202 Pa. 511, 52 A. 5), for, in the present case, the emission of the steam at such a point that the winds would frequently blow it across the bridge at the level of passing cars could, according to plaintiff's evidence, have been avoided at little or no expense to the Company. Nor is it a defense that it was the intervening agency of the west wind which carried the steam across the roadway, since the Company was bound to anticipate the action of the prevailing air currents: *Pittsburgh Forge & Iron Co. v. Dravo Contracting Co.*, 272 Pa. 118, 123, 124, 116 A. 147, 149; *Propert v. Flanagan*, 277 Pa. 145, 149, 120 A. 783, 784. Some point was made of the fact that other steel plants in the Pittsburgh district operated the same type of boilers and waterheater as that used by the Crucible Steel Company, and with exhaust pipes of no greater height, but this argument is ineffective because the location of the vent with reference to the roadway of the bridge called for special treatment. In the piquant language of Mr. Justice HOLMES: "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not": *Texas & Pacific Ry. Co. v. Behymer*, 189 U. S. 468, 470. Or, as was said in *Indermaur v. Dames*, (1866) L.R. 1 C.P. 274, 288, 19 Eng.

Rul. Cas. 64, 78: "No usage could establish that what was in fact unnecessarily dangerous was in law reasonably safe, as against persons towards whom there was a duty to be careful." See *MacDougall v. Pennsylvania Power & Light Co.*, 311 Pa. 387, 396, 397, 166 A. 589, 592, 593.

No complaint is made in regard to the amount of the verdicts in favor of the administratrix of the Hudson estate, but it is contended, we believe with justification, that the $17,000 verdict in favor of Mary R. Lavelle is excessive. When she brought suit her demand was for $15,000. Her injuries consisted of a fracture of both bones of the left forearm, a fracture of two of the metatarsal bones of the right foot, and a slight bruise or contusion of the forehead. The fracture of the foot was set without an open reduction and no permanent disability has resulted from it, although occasionally there is some slight swelling of the ankle. The fracture of the bones of the left forearm required two successive incisions in order to insert a plate in each bone fixing the parts in proper alignment; subsequently another incision was made to remove one of the plates; the other will not be removed unless circumstances require it. There is some scarring from these operations, but apparently no serious, permanent limitation of motion. Miss Lavelle complains of occasional headaches and dizziness, but these are subjective symptoms and no evidence was presented of any organic lesion, although undoubtedly she suffered a temporary cerebral concussion. Her occupation is that of bookkeeper and clerk and her salary $27.70 a week. She was 37 years of age at the time of the accident. She was in the hospital for about eight weeks and was absent from work as a result of the accident some five or six months in all but was paid her wages during the entire period. Her expenses in the hospital and for surgical and medical care amounted to approximately $1,250. It is said that since the accident she is not able to do her work without some assistance,

but she is receiving the same wages as before. Without attempting in any way to minimize her injuries or the pain and suffering resulting therefrom, we are of opinion that a recovery of more than $12,500 would be excessive.

The judgments in favor of Helen M. Hudson, administratrix of the estate of Arthur F. Hudson, deceased, are affirmed; the judgment in favor of Mary R. Lavelle is reduced to $12,500, and as thus modified is affirmed.