The judgment of the district court will be affirmed.

Chester S. SCHREFFLER, Appellant,

v.

BIRDSBORO CORP., Defendant-Appellee,

v.

BETHLEHEM STEEL CORPORATION.

No. 73–1338.

United States Court of Appeals, Third Circuit.

Argued Oct. 29, 1973.

Decided Jan. 24, 1974.

S. Robert Levant, Richter, Syken, Ross & Levan, Philadelphia, Pa., for appellant.

Theodore W. Flowers, Thomas Raeburn White, Jr., White & Williams, Philadelphia, Pa., for defendant-appellee.

Before HASTIE, ALDISERT and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

We are concerned in this case with the claim of error in the entry of a directed verdict for the defendant in a personal injury suit brought on the theory of defective design of industrial equipment. While the legal principles are not particularly complicated, the highly specialized nature of the machinery and manufacturing operations involved require a somewhat extended discussion of the factual background.

Appellant Chester S. Schreffler, an employee of Bethlehem Steel Corporation, was severely injured at its Steelton, Pennsylvania plant when a fellow employee caused a load of hot steel billets to be pushed against Mr. Schreffler, squeezing him against the side of the machine on which he was working. The accident occurred on March 13, 1965 as the appellant was fastening chains around a load of billets resting on a "transfer table" preparatory to having a crane lift them to a nearby railroad car.[1]

In the course of his duties as a "cradleman," it was necessary for Schreffler to stand upon the "transfer table" which was located between the "straightener" (a component utilized to straighten some of the rolled steel products manufactured in the mill) and the "shear" (a machine used to cut steel). The steel exiting from the "straightener" would be carried forward by a set of rollers, then moved in a reverse direction by a second set of rollers into the "shear" mechanism.

The "table" consisted generally of rollers in two parallel series separated by a number of parallel steel rails roughly twenty feet long and spaced five feet apart, running perpendicular to the line of direction of the rollers and at the same level above ground. A "rope drag" or "rope transfer," consisting of multi-

1. A "billet" was described in the testimony as an elongated square bar of steel which is an intermediate product, intended to be reheated and rolled again. Each billet measured 4″ x 4″ in cross section and was about 30 feet long. A "load" is a group of six billets, lying side by side, one row high. Testimony indicated that two "loads" of billets were on the table at the time of the accident.

ple depressible dogs pulled by chains, slid the various steel products over the rails from one series of rollers to the other. In addition to its function of facilitating the change of direction of the material being manufactured, the area between the rollers where the rails were located was intended to act as a temporary storage area for material being processed.

When Schreffler stepped onto a wire grating platform located between two of the rails, there were already two stacks of billets lying side-by-side on the surface of the rails. He had put the chain around the first stack of billets and was continuing his work when the accident occurred.

The rope drag operator had started an additional billet over the table from the first set of rollers to add to the second "load" when his attention was distracted by another billet coming out of the straightener. He was concerned about being struck by this billet, forgot that the billet on the table was continuing its progress toward the plaintiff, and consequently did not stop the machine in time.

The table was one of a number of items of mill equipment which had been manufactured by the defendant Birdsboro and installed in 1959 by the third-party defendant, Bethlehem.

Birdsboro, at the request of Bethlehem, had originally submitted a proposal to manufacture and sell the equipment in 1957, but the plan for a new mill was not carried through to fruition at that time. Bethlehem later revived the project, and with minor variations of the original plans and specifications, Birdsboro furnished the equipment in 1958 and early 1959.

The specifics of the machinery had been agreed upon after consultation between Birdsboro and Bethlehem engineers and to a great extent represented a joint effort of the two companies. It was understood that not all of the existing equipment in the Bethlehem plant was to be replaced, nor was Birdsboro given carte blanche to set up a complete mill. Bethlehem determined what new machinery and equipment it wanted and undertook the work of installation with its own employees. For example, while Bethlehem at one time had thought that it would extend its "cooling bed" and asked for a quotation from Birdsboro, that part of the project was never carried through, and Birdsboro was not asked to manufacture that item.

Although Bethlehem was to install the machinery, the contract did provide that Birdsboro was to have an erector on the scene to furnish technical advice. However, he was given no authority over anyone at Bethlehem. When the work was completed in March of 1959, the Birdsboro representative left the premises.

The installation of the transfer table, which measured 90 feet by 30 feet and had a gross weight of approximately 500,000 pounds, was a substantial undertaking and required the excavation of a foundation so that the table could be properly positioned. As originally designed, the spaces between the rails of the transfer table were left open, thus leaving a gap between the rails through which objects could fall to the floor several feet below. However, at the time of installation, Bethlehem placed solid steel plates between four of the sets of the rails, at a depth of 16 to 18 inches below their top surfaces.

The record does not disclose what use of these solid steel plates was contemplated at the time of their installation, but it is known that during the period between the time production of billets began in December, 1960 and the accident in 1965, the solid steel plates were utilized as walk-ways or platforms by the "cradlemen" who worked on the transfer table to unload billets.

The testimony was somewhat imprecise, but it seems that about a year or two after installation of the table, Bethlehem placed sheets of open steel grating in three or four of the remaining open spaces between the rails in a position similar to that of the solid steel plates.

This was done in order to prevent falling accidents by the cradlemen working on the table. No evidence indicates any knowledge on the part of Birdsboro that this additional modification had been performed.

The machinery which Birdsboro had furnished is part of a "merchant mill" which produces such specialty steel items as rails, cutting edges, tractor shoes, guard rails, curb facing, and other products in addition to "billets" and "rounds" (rounded equivalents of billets).

Before the renovation, the mill had produced billets which were about 2 inches by 2 inches in cross section. But it was not until December of 1960, about a year and a half after delivery of the Birdsboro equipment, that Bethlehem began to manufacture billets using the new machinery.

Though it was not necessary for billets to be put through the "straightener," the practice was to adjust this device in such a fashion that the billets could pass through it, a procedure called "dummying." After being taken from the rollers by the rope drag, the billets were lifted to a railroad car by a crane hooking onto the chains fastened around the loads by the cradlemen.

Although there were billet discharge points at prior locations in the line of production,[2] they had not been utilized because experience had shown that the billets did not cool sufficiently in the old cooling beds. The new equipment, being more efficient, produced more billets in any given period of time than the old mill. Consequently the old cooling beds were not able to cope with the increased capacity of the new equipment. Therefore when the billets, not yet sufficiently cooled, were dropped into the cradles, warpage and bending occurred. To correct this problem, Bethlehem then began to take billets from the production line at the transfer table. Only billets were unloaded from this point, other products being taken from the line elsewhere.

In 1962 a safety analysis was prepared by Bethlehem experts recommending that steel "safety stops" be used on the transfer table at appropriate times to assure that the billets, moving from the first set of rollers, would not be moved all the way over to the other edge of the table where the cradlemen were working. These devices would prevent movement of a billet against a man if he remained in the area between the safety stop and the edge of the table. However, the company never adopted this safety measure, and it seems clear that if it had done so, the plaintiff would not have been injured.[3]

2. (a) The testimony of W. L. Hoy, a former supervisor, indicates that billets could be discharged at a "yard kickoff" point which is located in the line of production just after the "hotbed" and before the straightener roller line. It was further indicated that the "yard kickoff" existed before the mill renovation. Unloading billets here was discontinued at an unspecified date because the procedure was too slow for mill output and because billets became bent when pushed into the cradle.

(b) A second kickoff point was found in the area just before the straightener. Discharge at this point also left billets badly bent.

(c) A third kickoff point was found in the area immediately beyond the "shear." This was abandoned because only one billet could be "dummied" through the "shear" at a time. The bending problem also occurred here.

3. A Bethlehem Steel Safety Bulletin issued in May, 1965, shortly after the plaintiff's accident, said in part:

"Six months previously a Job Safety Analysis had been made to cover this hooking-up job. The supervisor had recognized the possibility that men might be caught between the billets and the roller line, and had established a recommended safe job procedure. His recommendation: three steel stops to prevent billets from reaching the actual point where the men stand for their hook-ups. It was a good analysis—but the ironic part of the story is that the stops were never made!

"Another irony involved in the accident was this: The Job Safety Analysis for the operator of the transfer bed require that billets should *not* be moved when men were in a position to hookup a lift." (Exhibit P–12)

The record does not show that Birdsboro was ever informed of the use of the transfer table as an unloading point, nor was it told about the recommendation of the Bethlehem safety experts, nor indeed was there any evidence that the defendant knew that workmen would be on the table while hot steel products were being moved across it.

Bethlehem did not produce billets in the mill every day but usually did so only once or twice a month.

The plaintiff based his suit on theories of both strict liability under Section 402A of the Restatement of Torts [4] and common law negligence. He contends that Birdsboro knew or should have known that Bethlehem would produce billets and that the only place they could be removed from the production line without bending was at the transfer table. He argues, therefore, that Birdsboro had a duty to plaintiff and the other workmen in the plant to provide that the unloading process could be done in safety. The trial court, however, finding that there was a lack of proof of essential elements to support this theory and, in addition, that Bethlehem's conduct was a superseding cause, dismissed the case at the conclusion of the evidence which plaintiff presented at the trial.

As the factual background makes clear, this is not a typical 402A case for we are not concerned here with a standard production item sold to the general public which malfunctioned or otherwise evidenced a manufacturing defect. Although he disclaimed such a theory at one point during the trial, it would seem that the plaintiff is in effect claiming a design defect.

The plaintiff's position may fairly be stated to be that the defendant Birdsboro should have foreseen:

1. That Bethlehem would make billets;

2. That the three existent discharge points were inefficient and would damage the billets;

3. That billets could only be removed expeditiously and in an undamaged state at the transfer table;

4. That unloading billets at that point would require men to get up on the table;

5. That Bethlehem would not install safety stops or other appropriate safety measure to protect its employees working on the table; and

6. That therefore Birdsboro should have manufactured the transfer table in a different design.

Assuming that Birdsboro might have expected that Bethlehem would make billets, it does not follow that the use of the transfer table for unloading purposes would be anticipated. As already noted, there was evidence that there were at least two discharge points for billets located in the line of production before the transfer table was reached. So far as the evidence showed, Birdsboro's expectation of use of the transfer table was limited to that of a transfer mechanism and as a temporary storage place.

Plaintiff contends that the increased capacity and speed of the new mill equipment should have alerted the defendant to the fact that the steel would not be cooled sufficiently to be discharged at the pre-existing locations. But the decision as to the capacity needed for the cooling beds was made by Bethlehem, and it is sheer speculation to assume that Birdsboro was alerted to any potential deficiencies in the cooling process. This was an area where Bethlehem retained discretion, and there was no evidence that the defendant was to be concerned with it. It was Bethlehem's decision, not Birdsboro's, which resulted in the retention of that part of the facility.

It is undisputed that billet production requires the use of neither the "straightener" nor the "shear," nor would it be expected that these steel products would be processed through the

---

4. This was adopted as the law in Pennsylvania in the case of Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966).

machines. Hence, there was nothing in the layout itself which would suggest that the billets would not be removed at some point in the production line before arriving at the straightener.

The plaintiff's theory becomes even more attenuated in postulating that Birdsboro should have expected that men would be on the transfer table during unloading procedures. The design of the equipment as it was developed by Birdsboro would negative such a proposition. It will be recalled that the table as it left defendant's plant consisted of an alternating series of rails and open spaces. That type of design would be unlikely to lead to belief that men would use the structure as a loading site. Standing with each foot on elevated rails five feet apart is hardly a normal or anticipated work position for heavy labor by steelworkers. Greco v. Bucciconi Engineering Co., 407 F.2d 87 (3d Cir. 1969).

It was only after Bethlehem had installed the transfer table that it added walkways to some of the open spaces between the rails and only later, apparently about the time that the production of billets began, that steel mesh gratings were placed in some of the remaining voids. Again, this action was taken by Bethlehem and not by Birdsboro. It is not without significance that it was the presence of the plaintiff upon one of the steel gratings that furnished one of the operative conditions which had a bearing on the happening of the accident.

Indisputably, after the defendant relinquished control, the table was so substantially modified that it was then feasible to use the equipment in a manner different from that which would have been expected from observation of the original design. *See* Kaczmarek v. Mesta Machine Co., 463 F.2d 675 (3d Cir. 1972). Thus the plaintiff failed to prove a critical prerequisite that the product was in the same condition, so far as was relevant, on the day of the accident as it was at the time Bethlehem acquired possession. Speyer v. Humble Oil and Refining Co., 403 F.2d 766 (3d Cir. 1968), cert. denied 394 U.S. 1015, 89 S.Ct. 1634, 23 L.Ed.2d 41.

The plaintiff contends that the erector must have known that Bethlehem had installed walkways on the table before he left the job, but the significance of such knowledge is not apparent. As owner and possessor, Bethlehem was free to make any modifications it chose. Birdsboro had no power to prevent Bethlehem from using the machinery in any fashion it wished and adapting its operations to suit its preferences. The danger inherent in having men on the table in the rail area during production was glaringly obvious, and protective measures were recommended by Bethlehem's safety department. Any further warnings by Birdsboro would have added nothing of value.

The transfer table had not been designed or constructed to be a takeoff point. Its utilization for this purpose was obviously an expedient adopted by Bethlehem to meet a situation which neither it nor Birdsboro had anticipated.

The plaintiff proposed to show through expert testimony that there could have been other provisions made for takeoff locations. This again is a familiar example of post facto reasoning with all the advantages of being able to focus on a specific problem, rather than being required to plan for a multitude of ill-defined future possibilities. It does not require an engineering background to realize now that a more efficient and safer method of removing billets from the production line could have been designed. But there is no evidence that Bethlehem was aware of possible difficulties which might arise in this phase of its operations or that it consulted defendant about any problems when the renovation was in the planning stages.

The practical means to protect the working men at the plant was the use of safety stops. It was capable of implementation by Bethlehem without any ad-

vice, knowledge or assistance from Birdsboro.

■ It matters little whether the plaintiff's claim be under Section 402A or negligence because a requirement under both theories is that the defendant's conduct or the defect in its product or design be a proximate cause of the accident. Here it is clear that the test was not met. While it is generally true that proximate cause is a question for the jury, it is not invariably so. Where the critical facts are not in dispute and only their legal effect is in issue, the trial judge properly should rule on the question.

■ The district court was correct in its decision to grant a directed verdict because " . . . the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." Denneny v. Siegel, 407 F.2d 433, 439 (3d Cir. 1969).

In addition to his conclusion that the plaintiff had failed to prove a case of actionable conduct against the defendant, the learned district judge stated as an alternative ground that the negligence of Bethlehem was a superseding cause of the plaintiff's injury.

There is an overlap of legal theories in some situations where lack of proximate cause is intertwined with superseding cause because the same facts may furnish the basis for either doctrine. In this event, it probably is immaterial which theory is espoused because the end result will be the same.

Here the negligence of Bethlehem did not actually concur with conduct on the part of Birdsboro to bring about the accident. The inattention of the operator of the rope transfer, the inexplicable failure of Bethlehem to implement its own safety recommendations, and its unilateral decision to modify the table are all factors which overwhelm and supplant any alleged dereliction of Birdsboro. Lending strength to the superseding cause theory is the evidence that there was an interval of six years between the date of sale and the acci-

dent, during which time Bethlehem was in sole possession and control of the equipment and, in view of its obligations as an employer, justifiably would be expected to take necessary steps for the safety of its employees. See Prosser, Torts 681 (4th ed. 1971). Restatement of Torts 2d § 452, comment f.

Thus, we hold that the action of the court below was correct on either ground.

We have examined the additional contentions by the plaintiff that the trial judge was incorrect in excluding the testimony of certain expert witnesses and made other improper rulings on evidence. We conclude that the rulings were within the discretion of the trial court and were not erroneous.

The judgment of the district court will be affirmed.