**Donald E. GEORGE**

v.

**MORGAN CONSTRUCTION CO.**

v.

**U. S. STEEL CORP.**

No. 70–586.

United States District Court,
E. D. Pennsylvania.

Jan. 30, 1975.

Herbert Kolsby, Kolsby & Wolf, Philadelphia, Pa., for plaintiff.

Edward W. Maderia, Jr., Philadelphia, Pa., for defendant.

## OPINION AND ORDER

JOHN MORGAN DAVIS, Senior District Judge.

This case has been tried and the jury returned a verdict in favor of the plaintiff in the amount of $750,000. The defendant Morgan Construction Co. ("Morgan") filed a post trial motion for judgment n. o. v., or in the alternative, for a new trial.

The case arose from the injury of a steel employee, Donald George ("George"), who was working at U. S. Steel's bar mill in Fairless Hills, Pennsylvania. In the course of his employment by U. S. Steel, and while working in this mill, he was hit by a "cobble" and severely injured. A "cobble" is a piece of round stock which, while still in process, and at a temperature in excess of 2000°F breaks free of the mill ma-

chinery which is processing it, and is ejected into the part of the mill where the men are working. He was dissatisfied with the compensation he obtained from Workmen's Compensation, and accordingly sought recovery against Morgan, the manufacturer of the mill, under two theories (1) Strict liability under § 402A of the Restatement (Second) of Torts, alleging a design defect, and (2) negligence in designing the mill. The plaintiff withdrew the former theory and allowed the case to go to the jury on negligence.

A rolling mill is a complex of machinery, which generally consists of a track ("pass line") connecting a series of stands or roll housings through which hot pieces of steel are rolled and reduced to a linear steel product with a specified profile or cross-section. There are many different types of rolling mills including blooming, billet, rod, and bar mills. In the present case, we are dealing with a bar mill, which heats steel billets to temperatures in excess of 2000°F. The bar mill is capable of rolling several standard profile configurations, such as rounds, flats, and angles, and a wide variety of dimensions for each configuration.

The track, or pass line, of the Fairless Hills bar mill is laid out in a straight line 250–300 feet long. On one side of the track, referred to as the "inside" or "drive" side, are the motors for each of the mill's 18 stands. On the other side is a large open floor on which the mill crew works. Against this "working" wall and 20 feet above the floor is a glass-enclosed room 80 feet in length called the pulpit, which houses the control equipment for the motors and other components of the mill's machinery.

Each stand contains rolls and guides. As the hot billets proceed from stand to stand they enter each stand's entry guides and exit from each stand's delivery guides. Between these two sets of guides the metal is shaped by the action of the rolls.

Each stand is denominated either horizontal or vertical (edging) depending on the direction of the action of its rolls. The open spaces between the last six stands are called looping tables. There devices called loopers form a bow or loop in the billet which maintains a necessary degree of flexibility in the metal.

As is typical in the industry, the Fairless bar mill is composed of three sections. The "roughing" and "intermediate" sections comprise the first 12 stands and are controlled from the pulpit by the second or assistant speed operator. Stands 13 through 18 are the "finishing" section or train, and they are each individually controlled by the first speed operators.

The loopers are controlled by the looper operators. As a billet proceeds through the mill it starts slowly and gains speed as it is reduced more and more at successive stands. The greatest speed attained by any product on the bar mill is 30 mph. for $\frac{3}{8}''$ rounds at stand 18. At the same time it is elongated far beyond the original length of the billet. The bars exit from the last stand into a 400-foot cooling bed.

Normally a billet completes its passage through the bar mill without incident and emerges as a product with the desired profile salable to U. S. Steel's customers. At times, however, a billet leaves the mill before entering the last stand. This is called a "cobble". Most cobbles are "front end" cobbles where the head end of a billet passes through the delivery guides of one stand but fails to enter the entry guides of the next. Instead it spills out onto the mill machinery or the floor. When this occurs, the mill is shut down and the cobble is "cleared" by winding it up and removing it by crane. Cobbles typically occur on the Fairless bar mill at the rate of about two per eight-hour shift or "turn", but many more may occur at any given time. Their incidence is largely unpredictable on an individual basis: cobbles may occur at any time or anywhere on the mill.

There are four prime reasons for cobbles: (1) a defect in the steel; (2) an improper steel temperature; (3) an improper mill setting (e. g. worn or improperly adjusted rolls or guides); and (4) improper mill control (e. g. incorrect control of speed or looping action). These are all aspects of *operation*, not *design*. It is possible in theory to run a mill with no cobbles but this has proved to be impossible as a practical matter. Both designers and operators of bar mills, and indeed all the parties in this present lawsuit, realize that cobbles are bound to occur given present technology despite their attempts to eliminate or minimize them.

Morgan's design for the Fairless bar mill contained tri-faceted metal shields on the *drive* side of the looping tables between stands 12 through 18 but, in accordance with Morgan's conscious decision, contained no guards, shields or other structures on the *working* side of the mill intended to come between cobbles and workmen in the proximity of the mill.

As stated, plaintiff concedes that cobbles can not be engineered out of such a steel mill. However, he contends that this failure to put up "cobblescreens" or guards to protect the workers from this inevitable danger constitutes negligent design in constructing the mill.

Defendant's argument in this case is that the failure to put up cobblescreens was a necessary evil, since the danger created by putting them up was greater than the danger of not putting them up. It argues that the erection of this safety device would block the view of the people controlling the steel mill from the pulpit. The plaintiff counters that the mill could have been so designed that the cobblescreens could have been erected without blocking the pulpit, by putting the pulpit on the drive side of the mill instead of the working side. We agree with the plaintiff's contention. As stated in David Hume, Dialogues Concerning Natural Religion, Part XI, Norman Kemp Smith edition (Edinburgh: Nelson & Sons, 1935), p. 204:

. . . did I show you a house or palace, where there was not one apartment convenient or agreeable; where the windows, doors, fires, passages, stairs, and the whole economy of the building were the source of noise, confusion, fatigue, darkness, and extremes of heat and cold; you would certainly blame the contrivance, without any further examination. The architect would in vain display his subtlety, and prove to you that if this door or that window were altered, greater ills would ensue. What he says, may be strictly true: the alteration of one particular, while the other parts of the building remain, may only augment the inconveniences. But still you would assert in general, that if the architect had had skill and good intentions, he might have formed such a plan of the whole, and might have adjusted the parts in such a manner, as would have remedied all or most of these inconveniences.

A good architect would have designed the house in such a way as to avoid these disadvantages, so that one would not have to choose between a design that was bad and one that was worse. And in the same way, a non-negligent Construction Company would have designed the steel mill in such a way as to avoid requiring the Steel Company to choose between the Scylla of no cobblescreens and the Charybdis of an obstructed view from the pulpit.

Defendant argues, however, that plaintiff has not introduced sufficient competent, probative evidence to meet his burden of proving that defendant was negligent in its design of the bar mill. Both parties agree that one element of proof is an alternate design of the mill that would have prevented plaintiff's accident, would have been reasonably safe, and would have been functionally feasible within the state of design development during the time (1951–3) when the bar mill was constructed and sold. In other words, the plaintiff had to show what the defendant could and should have done differently. There

were three expert witnesses whose testimony satisfies plaintiff's burden of proof as to this element: Joseph E. Molle, Miles Morgan, and Alfred E. Baccini.

Joseph E. Molle is the roller on the Fairless bar mill, which is the highest non-management position. He had worked for U. S. Steel for 37 years and worked in the bar mill for the 20 years since it was first installed. During those 20 years he held practically every job in the mill. George was a member of Molle's crew when he had his accident, but Molle was not present at that time. He testified that the mill would be a lot safer if the pulpit were placed on the drive side of the mill rather than the working side, or that there could be two pulpits: one on each side of the mill.

█ As stated, Molle was not testifying as a factual witness, on this point, but as an expert witness. Although admittedly not an engineer or a man with other academic credentials, Molle was an experienced workman in the bar mill. As such, he is qualified to render expert testimony in this case. Globe Indemnity Co. v. Highland Tank and Mfg. Co., 345 F.Supp. 1290 (E.D.Pa.1972), per Newcomer, J.; Abbott v. Steel City Piping Co., 437 Pa. 412, 420–421, 263 A.2d 881 (1970). Therefore, his expert testimony, based on his experience in the mill, supplied the alternate design of the mill in which cobblescreens could be constructed without blocking the view from the pulpit.

Miles Morgan is the Chairman of the Board of the Morgan Construction Co. He retired from the position of First Vice-President in 1965. He was Vice-President and then First Vice-President during the time of the design and installation of this mill. He testified concerning the design and feasibility of cobblescreens, but not concerning the alternate design of putting the pulpit, or a second pulpit, on the other wall. However, he submitted an alternate design of his own: a cobblescreen made of structural steel members filled in with heavy wire mesh welded to those members. Such a cobblescreen could protect workers and not impair visibility (N.T. p. 3/84).

Alfred E. Baccini was the third witness to offer expert testimony on the subject of an alternate design. He is a safety engineer who graduated from Drexel University in 1936 with a major in machine design and mechanical engineering. He did post graduate work at Drexel University, Pennsylvania State University, and Princeton University. He is a registered professional engineer, and has been one since 1948 in the Commonwealth of Pennsylvania. His specialty has always been safety engineering, and he has taught a course in it at Drexel's evening college for over 15 years. He was also in charge of Drexel's Department of Special Studies, and was one of the 60 people to be honored at the convocation of the 60th anniversary of Drexel. His honor was for work done in safety engineering. He is a member of the American Society of Safety Engineers and the Veterans of Safety, and has consulted with numerous large companies. In particular, he was technical consultant to Atlantic Richfield where he designed machine guards and guards for hazardous conditions of various types.

Defendant attacks Baccini's testimony on two independent grounds: (1) that he was not qualified to testify as an expert, and (2) that his testimony did not establish an alternate design of the mill that would have been safer, feasible, and would have prevented plaintiff's accident.

The first ground alleged is that Baccini was not qualified to testify as an expert because he admittedly lacked expertise in the design and operation of bar mills. However, he was not admitted as an expert on designing and operating a steel mill, but as an expert on safety engineering. His qualifications amply prepared him as such.

█ The plaintiff claims that the defendant failed to design a bar mill safely. Thus there are two relevant fields of expertise: Design engineering and

Safety engineering. The experts on design engineering, as stated, were Molle and Morgan. The expert on Safety engineering was Baccini. The fact that Baccini was not an expert on designing a bar mill is no more objectionable than the fact that Molle and Morgan were not experts in safety engineering. Each witness testified as an expert in his own field, and need not have expertise in other fields to do so.

The difference between safety engineering and expertise in designing steel mills is apparent not only from what we said about Baccini's qualifications, but also from his testimony itself. Accordingly, Baccini testified that he was qualified to give an opinion about the guarding of the Fairless bar mill because guarding involves safety engineering principles that apply equally to all machines. (N.T. 5–14). When asked whether he was an expert in the steel industry, Baccini answered that he considered himself "an expert in the field of safety engineering, which is an expert in all industries. Anything that deals with machines . . . ." (N.T. 5–71). In a heated exchange during defendant's interrogation regarding the different types of mills he may have seen before, Baccini remarked: "Anyway, a machine is a machine. It really doesn't matter." (N.T. 5–28). He testified that a safety engineer was capable of assessing whether the mill—as well as any other machine—was dangerous and, if so, how to render it safe.

He defined safety engineering as a discipline "concerned with the planning, development, improvement and evaluation of the safety components of integrated systems, which include men, material, equipment and environment, in order to achieve optimum safety effectiveness in the areas of both protection of people and protection of property." (N.T. 5–8–9). He testified that in the field of safety engineering there are established principles generally applicable within the field for protection of people or property expected to be exposed to a danger which cannot be engineered out of a machine. Under those circumstances safety engineering requires that guarding for the machine be provided to protect people. (N.T. 6–45–46).

An expert witness must show special knowledge of the very question upon which he is to express an opinion. In Re Voluntary Termination of Parental Rights, 449 Pa. 543, 551, 297 A.2d 117 (1972); Logsdon v. Baker, 366 F. Supp. 332, 336 (D.D.C.1973). But the test applied to an expert's qualifications must not set the standard of qualification so high as to exclude the only kind of testimony ordinarily obtainable in such cases. Trowbridge v. Abrasive Co. of Philadelphia, 190 F.2d 825, 829 (3rd Cir. 1951). Here the question is one of safety engineering, and the only kind of testimony ordinarily available is that of a Safety Engineer. The test should not be set so high as to exclude such testimony. Baccini's lack of experience with steel mills only goes to the weight of his testimony, not its admissibility. Stempel v. Chrysler Corp., 495 F.2d 1247 (5th Cir. 1974).

In the recent case of Kuisis v. Baldwin Lima Hamilton Corporation, Pa., 319 A. 2d 914, a decision of the Supreme Court of Pennsylvania dated May 22, 1974, concerning the refusal of the lower court to permit a "safety engineer" to testify and express an opinion on matters of design, the Supreme Court reversed the lower court, and said:

"The standard of qualification is a liberal one; 'If a witness "has any reasonable pretension to specialized knowledge on the subject under investigation, he may testify, and the weight to be given his [testimony] is for the jury" ' ".

In that case, the Supreme Court refers, by footnote, to Brooks v. Allis-Chalmers Manufacturing Co., 163 Cal.App.2d 410, 329 P.2d 575 (1958), another case where a "safety engineer" was permitted to qualify and testify as to design safety as it related to the product. See also Moodie v. Westinghouse Electric Corp., 367 Pa. 493, 501, 80 A.2d 734 (1951).

The defendant cites the case of Ward v. Hobart Mfg. Co., 450 F.2d 1176 (5th Cir. 1971), in which the plaintiff's only expert witness was a highly qualified mechanical engineer who had no experience in the design of any type of machinery. The Court held that although this witness was competent to give expert testimony on the mechanical operation of the machine, he was not competent to testify on the issue of proper design of that machine. (Id. at 1182–1183). Since there were no other expert witnesses to support plaintiff's contention of negligent design, the Court of Appeals reversed the trial court with directions to enter judgment for the defendant. (Id. at 1189). This is in accord with our present decision that Baccini was qualified to testify as a safety engineer, and that Molle and Morgan were qualified to testify as experts in the design and operation of a bar mill.

In the case of Globe Indemnity Company v. Highland Tank and Mfg. Co., 345 F.Supp. 1290 (E.D.Pa.1972), also cited by defendant, Judge Newcomer also distinguished safety engineering from other types of engineering, in holding that an electrical engineer, who was not a safety engineer and had no contact with the molasses industry, was not permitted to testify with respect to "safety design" criteria of molasses holding tanks. Judge Newcomer's opinion further stated (Id. at 1292):

> "In making these decisions as to the qualifications of the plaintiff's experts, the Court was well aware that an expert witness may not have personally and cannot be expected to have personally experienced the factual situation in question about which he is to testify in order to qualify. The plaintiff does not have to get the best possible expert available on the subject . . ."

Thus Baccini need not be as familiar as defendant demands with the design and operation of a bar mill.

The defense puts its heaviest reliance on the case of Schreffler v. Birdsboro Corp., 490 F.2d 1148 (3rd Cir. 1974), because Baccini himself was disqualified by Judge Huyett from testifying as an expert. This case also was an action brought by an injured steel mill employee against the designer and manufacturer of a rolling mill. There the plaintiff alleged that the designer of a billet mill at Bethlehem Steel's plant in Steelton, Pennsylvania, should have designed certain equipment differently because of the manner in which its purchaser handled billets which had been discharged from the mill. However, there is no opinion of Judge Huyett, and the opinion on appeal does not discuss the question of the disqualification of the witness to testify, it simply affirmed the trial court's discretion to disqualify him (Id. at 1154). Apart from the fact that the Court of Appeals never specifically discussed Baccini's testimony at all, the *Schreffler* case is distinguishable from the present case because the purpose of Baccini's testimony in *Schreffler* was to state, as a machine designer and a safety expert, what types of things machine designers should foresee and protect against and, in particular, whether the designer of the specific equipment in question should have foreseen the specific manner in which it was used. In other words, in that case Baccini was called upon to testify as an expert with respect to what use or uses a machine designer should have anticipated that his machine would be put to. The court held that this required specialized knowledge of the design and operation of steel mills which Baccini admittedly did not and does not have. In the case at bar, however, Molle and Morgan testified with respect to these aspects of the case, and Baccini as a safety engineer was simply asked how one in his field, which is machine guarding, would guard this machine.

Thus, in the case at bar, all of the testimony which was required to come from years of experience in the steel industry came from Molle and Morgan, whereas the testimony of Baccini had to do specifically with the field of safety

engineering. Accordingly, the Court found this witness qualified to testify in accordance with the decided opinions, leaving the weight to be given to this witness, as the weight to be given to all witnesses, for the jury to determine.

The second prong of defendant's attack on Baccini's testimony is that it did not adequately establish an alternate design of the bar mill which would have been safer, functionally feasible in 1951–3, and would have prevented plaintiff's accident.

On direct examination, Baccini testified that "positive protection" for the workers "could have been accomplished by proper guarding by either encapsulating the spaces between the stands or covering it with a screen of expanded metal, punched metal, or wire mesh that would be enclosed in a framing of steel and would be affixed as a permanent fixture to the machine, so that, if a cobble occurred, it would remain within the confines of the guard and never escape that area so that it would cause injury to any person who had to work in that area or close by." (N.T. 6–53).

On cross-examination and redirect Baccini further testified to alternate designs of the mill that would provide the positive protection yet not impede the vision of the people controlling the steel mill from the pulpit. "You can make guards out of bulletproof glass. If it is a matter of visual acuity and you have to see the operation, the guards can be made out of bulletproof glass or they can be of what we call screen glass, or they can be of open mesh, expanded metal, wire screen, just so long as the guard itself is strong enough to withstand the impact of anything that might get loose and which it is encapsulating, which would be the reason for the bulletproof glass." (N. T. 6–100).

He further stated that a Morgan folder dated March 1966 depicts a no-twist rod mill manufactured by Morgan with cantilevered doors with glass panels in them so the mill can be observed during operation. If Morgan could provide such a structure for one mill, he stated they could have done so "for every other machine." (N.T. 6–100–12).

He concluded that there were many guards that could be utilized—expanded metal, perforated metal, screen mesh, bulletproof glass, cantilevered doors with windows, or a combination of any of them.

Defendant argues that Baccini several times confused Rod Mills with Bar Mills, and that his testimony was contradicted by defendant's experts (See Defendant's Brief pp. 27–34). Defendant's experts testified that the state of the art in 1951–1953 was such that Baccini's suggested guarding devices would not have been feasible. They testified that wire glass would rapidly become opaque due to environmental conditions in the steel mill (N.T. 9–78), that wire screen would affect visibility and cobbles would become entangled in it, (N.T. 9–78) and that no glass is "cobbleproof" (N.T. 10–52). However, contradiction by other experts, as well as alleged confusion between two different kinds of steel mills, are matters of impeachment of Baccini's testimony, and accordingly only go to its weight, not its admissibility. These points simply created questions of fact which the jury resolved adversely to the defendant.

In addition, defendant claims that these alternate designs are not adequate because they are not specific enough. When defense counsel asked Baccini for an elaborately detailed description of such a design, complete with drawings, Baccini stated that such a guard must be designed to fit each particular machine. "You don't do machine-design work sitting in a courtroom. I do mine over the drawing board . . . and after many conferences. It is just as intricate sometimes as designing the original machine, and there are just as many things to consider." (N.T. 6–113). We believe that the defendant is too demanding by expecting such an extraordinary degree of specificity. We find that the proposed alternate designs are adequate to meet the thres-

hold test for admissibility, and any further specificity or lack of it goes only to the weight of his testimony.

In arguing the lack of a specific alternative design, the defendant argues that there was no *objective* alternative design because there was no evidence introduced at the trial that other similar steel mills had such design in effect at or before the time of manufacture of the bar mill in question. (See Defendant's Brief pp. 23–27). Thus we must review the legal significance of customs and standards in the industry. "By the great weight of modern American authority a custom either to take or to omit a precaution is generally admissible as bearing on what is proper conduct under the circumstances, but is not conclusive." 2 Harper and James, The Law of Torts, sec. 17.3 at 977–78. Custom is relevant in determining the standard of care because it illustrates what is feasible, it suggests a body of knowledge of which the defendant should be aware, and it warns of the possibility of far-reaching consequences if a higher standard is required. (Morris, Custom and Negligence, 42 Colum.L.Rev. 1147 (1942); 2 Wigmore, Evidence, 3rd ed. secs. 459, 461). But custom should never be conclusive. As Judge Learned Hand said, "There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. . . . Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usage. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission." The T. J. Hooper, (2d Cir. 1932), 60 F.2d 737, 740.

The following principles would appear to be clearly established in the law of Pennsylvania:

A. Methods employed in any trade, business or profession, however long continued, cannot avail to establish as safe in law that which is dangerous in fact. Moushey, Admx. v. United States Steel Corp. et al., 374 F.2d 561, 567 (3d Cir. 1967).

B. What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it is usually complied with or not. Hemrock v. Peoples Natural Gas Company, 423 Pa. 259, 223 A.2d 687 (1966); Hudson, Admx. v. Grace, 348 Pa. 175, 34 A.2d 498 (1943); Donnelly v. Fred Whittaker Co., 364 Pa. 387, 72 A.2d 61 (1950).

C. The customary method of performing work could be a negligent method despite the fact that it was in general use in the trade. DeMarco v. Frommyer Brick Company, 203 Pa.Super. 486, 201 A.2d 234 (1964).

Thus we cannot conclude that any failure of plaintiff to introduce evidence that other bar mills contained such guarding structures, invalidates his establishment of an adequate and objective alternate design of the bar mill.

It should also be noted that Miles Morgan himself not only set forth an objective alternative design standard; he testified (though it has been denied by all other defense witnesses in the case) that the defendant supplied the actual objective alternative design in the form of drawings. In addition, there was an objective alternative design standard apart from Miles Morgan's designs and that was the ILO Code.

During Baccini's cross-examination the first reference was made to a document entitled the International Labour Organisation's *Model Code of Safety Regulations for Industrial Establishments for the Guidance of Governments and Industry*. In reply to a question of defendant's counsel concerning any research he may have done into the subject of cobbles after his visit to the Fairless Works, Baccini stated that he had researched information available on rolling mills and

found the ILO Code. (N.T. 6–92–93). He went on to characterize the ILO as the "oldest and perhaps the most prestigious safety organization in the world" (N.T. 6–92–93), and to praise its international safety code as one of the "bibles" of safety engineering. (N.T. 6–96). Baccini stated that the ILO is comprised of representatives from industry, manufacturing and labor and that the United States is one of over 100 nations represented by it. (N.T. 6–93). The United States Assistant Undersecretary of Labor for Foreign Affairs has always been a member. (N.T. 6–93). At a later point in the cross-examination in response to another question, Baccini stated that the ILO Code had a section on rolling mills known as Regulation 100, and that, in his interpretation, paragraph 10 of that section mandated the provision of guards at the open spaces between stands on bar mills. (N.T. 7–6–10). Paragraph 10 states:

> 10. Open spaces between separate sets of finishing rolls or rod mills shall be guarded.

He also testified over defendant's objection that the Code is, and was in 1951–53, generally accepted in the field of safety engineering (N.T. 7–43–44) and that it confirmed his opinion in this case. (N.T. 7–46). After Baccini left the stand defendant's counsel moved for the striking of his entire testimony. The motion was denied. (N.T. 7–63).

Over defendant's objections plaintiff's counsel utilized the ILO Code in his cross-examination of defendant's expert witnesses Wilson and Mercer.

Taking the first witness first, Baccini's testimony as to the ILO Code was in response to defense counsel's questions, so it could be argued that he waived any objection to what he himself brought forth. However, defendant claims that the answer was irrelevant and unresponsive because Paragraph 10 applies only to rod mills, and not to bar mills (like the Fairless Hills plant) nor more generally to rolling mills (which includes blooming, billet, rod, and bar

mills; see the third paragraph of this Opinion, *supra*).

Mercer was taken through each of the paragraphs of the rolling mill section and was asked for his agreement or disagreement. Mercer testified that he did not understand paragraph 10 as written and that it would only make sense to someone knowledgeable in the steel industry if the "or" were changed to "on". In his judgment the latter is what the author was attempting to say. (N.T. 11–97–98).

Plaintiff disagrees with this interpretation, and states in its brief that the Code should be taken exactly as printed, among other reasons, because the ILO itself had ample opportunity to revise and correct it, and yet did not change that passage. The record states this at p. 6–93, and the plaintiff attached pages from the current printing of the ILO Code which sets forth the results of what was clearly a line by line and word by word review of the entire Code on many separate occasions. These pages (54–55 of plaintiff's brief) include changes and additions to the Code, and particularly relevant to defendant's argument, errata are quoted on a page by page, line by line and word by word basis. Nowhere in this errata, from any of these revisions, can be found defendant's suggested errata, i. e., that the word "or" in Section 10 should read "on".

Thus, since neither side submitted any other evidence on the issue of interpretation of the Code, and since the ILO itself seemed satisfied with its Code, we simply have another of the many disagreements among experts that occurred during this trial. Accordingly, whether Baccini's interpretation or Mercer's interpretation was correct was a matter for the jury. As plaintiff points out, the court cannot rule as a matter of law that there is a misprint in the Code.

If paragraph 10 stands as written, then the first phrase "open spaces between separate sets of finishing rolls" would refer to rolling mills in general, of which bar mills are one type. If the

"or" should have read "on", then the phrase clearly refers only to rod mills, and hence would not be relevant to bar mills. Since we cannot conclude as a matter of law that there is a misprint, we cannot conclude as a matter of law that the phrase refers only to rod mills and is irrelevant. Therefore it was submitted to the jury for their consideration.

The ILO Code was also used in plaintiff's cross-examination of Wilson and Mercer. They were asked if they agreed or disagreed with its various provisions. It should be noted that the ILO Code was never introduced into evidence by either side. As we stated at trial (N.T. 9–97): "In my opinion it should be introduced by someone in authority over the ILO, and I will require that."

Since no such person testified, the ILO Code was never introduced as substantive evidence of its contents. However, such treatises can be properly used for impeachment purposes where, as in the instant case, the cross-examiner directs the attention of the expert witness to the contents of treatises expressing an opinion at variance with the opinion of the witness, and does so, not to prove the contrary opinion but merely to call into question the weight to be attached by the fact finder to the opinion of the witness.

Another set of evidentiary rulings, made in connection with plaintiff's establishment of an adequate alternate design, involved the admission of testimony on Post-1953 changes in the State of the Art of Rolling Mill Design. Defendant claims it was error to admit such testimony. Evidence of post-accident safety precautions is not admissible to prove prior negligence, but it is admissible to prove whether or not certain precautions would have been feasible, that is, whether or not there was a practical method which was neither too costly nor too burdensome to employ to prevent the accident. It is also relevant to show the condition of the mill at the time of the accident, and whether or not that con-

dition was a proximate cause of the accident. Bailey v. Kawasaki-Kisen K. K., 455 F.2d 392 (5th Cir. 1972); Steele v. Wiedemann Machine Co., 280 F.2d 380 (3d Cir. 1960); Incollingo v. Ewing et al., 444 Pa. 263, 294, 282 A.2d 206 (1971); Pressler v. Pittsburgh, 419 Pa. 440, 214 A.2d 616 (1965); Hyndman v. Pa. R. R. Co., 396 Pa. 190, 200–201, 152 A.2d 251 (1959); Ringelheim et al. v. Fidelity Trust Co. et al., 330 Pa. 69, 198 A. 628, (1938); Feldman, Penna. Trial Guide § 7.20.

Defendant also assigns as error the Court's ruling precluding him from arguing the alleged lack of other accidents at the Bar Mill in his closing argument to the jury. It is true that the absence of other accidents is relevant to the issue of negligence. Ward v. Hobart Mfg. Co., 450 F.2d 1176, 1182 (5th Cir. 1971); Carpini v. Pittsburgh & Wierton Bus Co., 216 F.2d 404, 407 (3d Cir. 1954). However, the record does not establish that there was an absence of other accidents. It does establish that Molle was struck by a cobble (N.T. 2–44), and that cobbles typically occur at the rate of about two per eight hour shift, but more may occur at any given time. (N.T. 2–19–20). At a side Bar Conference, prior accidents of the plaintiff himself were excluded from evidence as inadmissible. (N.T. 3–21–22). Nowhere does the record affirmatively show an absence of other accidents. Accordingly, defense counsel was not permitted to assume a fact not in evidence for the purposes of closing argument. Cf. Yoffee v. Penna. Power & Light Co., 385 Pa. 520, 543, 123 A.2d 636, 648 (1956).

Defendant challenged this exclusion of plaintiff's safety record on the grounds that prior accidents were evidence relating to the issue of contributory negligence and prior warnings from his superiors arising from these accidents were evidence relating to the issue of knowledge and assumption of the risk. Plaintiff's prior safety record was properly excluded because evidence of similar but disconnected prior acts of

negligence is not admissible to prove negligence on a particular occasion, nor is evidence of a person's general reputation for carelessness. Jamison v. Ardes, 408 Pa. 188, 193–194, 182 A.2d 497 (1962); Com. v. Etzel, 370 Pa. 253 (1952); Wyatt v. Russell, 308 Pa. 366, 162 A. 256 (1932); Aiken v. Pa. R. R. Co., 130 Pa. 380, 18 A. 619 (1889); Feldman, *supra* at § 7.24.

■ However, evidence of prior warnings, without mention of the accidents which occasioned them, is admissible and was in fact admitted on the issue of assumption of the risk. (N.T. 9–26–29).

This evidence was cumulative to the other evidence that the plaintiff knew of the risk. George had been employed at the Fairless Works for 30 years. (N.T. 3–58), and Molle indicated that the bar mill experienced at least two cobbles on each turn. There is likewise little question that George knew, understood and appreciated the danger of personal injury presented by cobbles. Since it is a simple matter of observation, George knew that there was no guard which enclosed the looping table between stands 13 and 14 and would have contained a cobble occurring at that point. Consequently, George realized the danger of being at the pass line, in particular stand 14, when the head end of a billet was approaching.

Yet defendant argues that barring the witnesses from going beyond the mere warnings emasculated the significance of those warnings. Their real impact is claimed to be that they were based on specific unsafe acts committed by George. He was told in each instance by his supervisors not to do something that he had just done because it was dangerous. As argued by defendant's counsel at trial (N.T. 9–6–7), supplying the context of the warnings adds immeasurably to a full appreciation of their meaningfulness and likely effect on George's understanding of the danger.

Nevertheless, because of the authority cited above and the cumulative nature of this evidence, whatever probative value it may have was greatly outweighed by its prejudicial effect. Furthermore, the defendant was not injured by our rulings, since much of what he sought came into evidence anyway. (N.T. 10–27–31).

■ To recapitulate, the defendant has argued that plaintiff has not introduced sufficient evidence of an alternate design of the mill which would have prevented plaintiff's accident, would have been reasonably safe, and would have been functionally feasible within the state of design development when the bar mill was constructed and sold in 1951–1953. However, we found from the record that plaintiff did introduce evidence sufficient to carry this issue to the jury, through the testimony of Molle, Morgan, and Baccini; and we explained our rulings relating to certain specific testimony on the ILO Code, on Post-1953 changes in the State of the Art of Rolling Mill Design, and on prior warnings given to plaintiff without mention of plaintiff's conduct giving rise to these warnings.

Defendant's second major set of arguments for his motion for Judgment N. O. V., and in the alternative, for a new trial, relates to the issue of proximate cause. The first of these arguments is that there was insufficient evidence that Morgan's negligent design was in fact a proximate cause of plaintiff's accident. His main contention in this regard is that Baccini's alternate design lacked sufficient specificity to permit the jury to make an informed and independent judgment of whether or not the guards he proposed would in fact have prevented the accident.

■■ The first answer to this argument is that we have already held that the evidence was specific enough to meet the threshold test of admissibility to go to the jury, and any additional lack of specificity over and above this threshold goes to the weight of the evidence, not its admissibility. The second answer is that Baccini was not the only witness to propose an alternate design. As stated, Miles Morgan also proposed a type of guard made of structural steel members

filled in with heavy wire mesh welded to those members. Also previously stated, Molle proposed that the pulpit be placed on the drive side of the mill rather than on the working side, or that there be two pulpits, one on each side of the mill. Either way, proposed cobblescreens could be used without impairing the visibility of the pulpit operators. It must be remembered that plaintiff's burden on the issue of causation is only to prove that it was more probable than not that the defendant's negligence was the proximate cause of the plaintiff's injury. See Kridler v. Ford Motor Company, 422 F.2d 1182 (3rd Cir. 1970; Frankel v. Lull Engineering Company, 334 F.Supp. 913 (1971); Smith v. Bell Telephone Co., 397 Pa. 134, 153 A.2d 447 (1959); Restatement (Second) of Torts § 433B(1) and Comment b.

■ Defendant's second argument is that the Court erred in refusing one of Morgan's points for charge relating to proximate cause. Defendant requested that the Court instruct the jury as follows:

"17. If you find that U.S. Steel would have removed the cobble guards of the type urged by plaintiff had Defendant Morgan supplied them, Morgan's failure to include cobble guards was not a proximate cause of the accident, and you should therefore find against plaintiff and in favor of Defendant Morgan." (N.T. 12–30).

This request was denied (N.T. 12–30), and the denial was reiterated when the point was raised again by defendant's counsel following the Court's charge but before the jury had retired. (N.T. 13–31). Instead the Court instructed the jury on the "but for" test in the abstract, in accordance with its policy not to comment on evidence.

This point arose because one of defendant's witnesses, Mr. Mott, stated that an encapsulating guard would have been inappropriate, and further stated that if such a guard had been on the mill when he became turn foreman or general foreman, and it proved to be inoperative, he

would have removed it. (N.T. 10–15–16 and 10–56). Thus defendant claims that there was evidence that U. S. Steel in the person of Mott would have removed the guards recommended by Baccini if Morgan had incorporated them in the bar mill's original design, i. e. U. S. Steel would have negated plaintiff's alternative design and the mill would have been as it actually was at the time of plaintiff's accident regardless of Morgan's conduct.

However, as stated, Baccini was not the only one to submit an alternate design. To take Molle's alternate design for example, if the mill had been designed with a pulpit on the drive side of the mill, guards could have been erected which would not have been inoperative or ineffective, and hence would not have to be taken down. Similarly, if the guards proved to be operative and effective, U. S. Steel surely would not have taken them down. There was ample evidence that such guards were feasible and could have been erected, and it would have been proper for the jury to believe that evidence and disregard Mott's statement that he believed encapsulating guards to be inappropriate. The factual basis for this point for charge is too tenuous for the Court to abandon its general policy of not commenting on evidence.

The Court drafted Special Interrogatories and, over defendant's continuing objections, submitted them to the jury pursuant to Rule 49(a), F.R.Civ.P. (N.T. 13–21–22). In essence, the jury was directed to answer four questions in the following order: (1) Was Morgan's design negligent and the cause of plaintiff's injuries? (2) Were plaintiff's injuries caused by his contributory negligence or assumption of risk? (3) To what damages is plaintiff entitled? (4) Was U. S. Steel's conduct negligent and a proximate 'cause of plaintiff's injuries? Defendant argues that directions between these questions to stop or go on to the next question depending on the answer, as well as the order of the questions, made it apparent to the jury that plaintiff would not recover unless they found Morgan negligent. A finding

only of U. S. Steel's negligence would have resulted in no recovery. The Court had also so advised the jury in its charge. It characterized George's suit against Morgan as the "principal action" and stated that the "second action" of Morgan against U. S. Steel, which "is separate and distinct from the first, becomes important only if you find in favor of the plaintiff and against the defendant, Morgan. Accordingly, I caution you that if you find in favor of the defendant, Morgan, in the main action, then you need not deliberate in the second lawsuit. This is because the liability of the third-party defendant, U. S. Steel, is contingent upon a determination of liability on the part of Morgan in the first action." (N. T. 13–14–15). Defendant objected to the interrogatories on this ground and requested that alternative questions be submitted to the jury. (N.T. 12–47–52), but the interrogatories were read as originally drafted. The jury found both Morgan and U. S. Steel negligent.

▮ It should be noted that defendant does not argue that the charge on this point is incorrect, only that the Interrogatories permitted the jury to know and understand the legal effect of its findings. They accordingly realized that plaintiff could not recover if U. S. Steel's negligence was the sole proximate cause of plaintiff's injuries.

▮ Both parties agree that the Court has broad discretion with regard to the question of whether to use written interrogatories or not, and the form of the interrogatories. Scott v. Isbrandtsen Company, 327 F.2d 113 (4th Cir. 1964); R. H. Baker & Company v. Smith-Blair, Inc., 331 F.2d 506 (9th Cir. 1964). But the defendant claims here that the Court abused its discretion by fully informing the jury of the legal consequences of its answers to the Interrogatories.

The cases cited by defendant in its brief stand for the proposition that if the Trial Judge decides *not* to so inform the jury, this is *not* an abuse of discretion. It does not follow, however, that if the Trial Judge *does* so inform the jury, this *is* an abuse of discretion. On the contrary, it is discretionary whether or not to so inform the jury. If defendant's argument is carried to extremes, it is clear that no general verdicts, as traditionally used throughout the United States, would stand, for in cases of general verdicts, the jury is traditionally told to answer the question of the original defendant's liability to the plaintiff, and if it finds no liability, that ends the case regardless of whether or not the negligence of the third party defendant was the sole proximate cause of plaintiff's injuries.

▮ Defendant disagrees with certain other portions of the charge, but in these instances he either failed to take exception to these portions at the conclusion of the charge, Cf. Dilliplaine v. Lehigh Valley Trust Co., 457 Pa. 255, 322 A.2d 114 (1974); or he simply disagrees with the wording of these portions without disagreeing with their basic statement of the law. The former cannot now be reviewed, and the latter is only a dispute over form, not substance.

We have considered all of the defendant's arguments and we find that there was no trial error. Accordingly, we will deny his Motion for Judgment Notwithstanding the Verdict, and, in the alternative, for a New Trial.

## ORDER

And now, this 30th day of January, 1975, for the reasons stated in the foregoing opinion, the defendant's Motion for Judgment Notwithstanding the Verdict and, in the alternative, for a New Trial, is hereby denied.