BANGOR & AROOSTOOK RAILROAD COMPANY, Plaintiff,

v.

The SHIP FERNVIEW et al., Defendant and Third-Party Plaintiff,

v.

I.T.O. CORP. OF NEW ENGLAND, Third-Party Defendant.

DELTA CHEMICAL, INC., Third-Party Defendant and Fourth-Party Plaintiff,

v.

William E. ABBOTT, Fourth-Party Defendant.

BANGOR & AROOSTOOK RAILROAD COMPANY, Plaintiff,

v.

FEARNLEE & EGER, Defendant.

Civ. Nos. 74–46–ND, 76–77–ND.

United States District Court, D. Maine, N. D.

Aug. 10, 1978.

William M. Houston, V. P. & Gen. Counsel, Bangor & Aroostook R. Co., Bangor, Maine, Howard H. Dana, Verrill & Dana, Portland, Maine, for Bangor & Aroostook R. Co.

Benjamin Thompson, Thomas R. McNaboe, Paul Vielmetti, Alan S. Polackwich, Portland, Maine, for Fernview and Fearnlee.

Gene Carter, Rudman, Winchell, Carter & Buckley, John M. Wallach, Bangor, Maine, Norman & Hanson, Portland, Maine, for Delta.

Harrison L. Richardson, S. Peter Mills, III, Portland, Maine, for I.T.O.

Richard W. Glass, Belfast, Maine, and John W. Ballou, Bangor, Maine, for Wm. Abbott.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND DIRECTION FOR ENTRY OF JUDGMENT

GIGNOUX, District Judge.

These two consolidated actions arise out of a collision which occurred at 0735 on the morning of August 21, 1974, when the dry cargo vessel FERNVIEW while attempting to dock at the Bangor & Aroostook Railroad Company ("BAR") pier at Searsport, Maine collided with the south end of the pier causing considerable damage to the pier. The collision occurred under conditions of reduced visibility and heavy fog. BAR has brought an action in rem against the FERNVIEW (Civil No. 74–46–ND) and an action in personam against the owner of the vessel, Fearnlee & Eger (Civil No. 76–77–ND). The ship and her owner have, in turn, impleaded as third-party defendants Delta Chemical, Inc. ("Delta"), the owner and operator of a sulfuric acid manufacturing plant which is situated approximately 1.3 statute miles northeast of the pier, and I.T.O. Corp. of New England ("I.T.O."), the stevedoring company whose employees were to unload the FERNVIEW after the ship was tied up at the pier. Delta has impleaded as fourth-party defendant William E. Abbott ("Abbott"),[1] the FERNVIEW's pilot on the morning in question. In each instance, the third- and fourth-party plaintiffs seek contribution from the impleaded party and also demand judgment against the impleaded party in favor of the plaintiff. See Fed.R.Civ.P. 14(c). Jurisdiction of the actions is predicated upon 28 U.S.C. § 1333(1) (admiralty and maritime jurisdiction) and 28 U.S.C. § 1332 (diversity jurisdiction).

By agreement of the parties, the issues of liability have been severed from the damage issues, and tried to the Court without a jury. Having received and considered the evidence and the written and oral arguments of counsel, the Court now makes its Findings of Fact and Conclusions of Law on the issues of liability for the collision, and directs entry of its judgment as follows:

## FINDINGS OF FACT

The Court's Findings of Fact are:

### Introduction

1. *The Pier.* The Bangor & Aroostook Railroad Company was and is a Maine corporation and the owner of the pier at Searsport, Maine, which was damaged by the FERNVIEW on the morning of August 21, 1974.

The BAR pier is a wooden structure approximately 800 feet long and 100 feet wide, set on pilings. It is situated in a dredged basin roughly one mile to the east of Searsport Harbor and extends in a southerly direction from a point of land at the

---

1. The Penobscot Bay and River Pilots Association, also originally impleaded by Delta as a fourth-party defendant, has been dismissed from the action. *See* Report of Pretrial Conference and Order, May 3, 1977.

entrance to Long Cove.[2] Sears Island and Buoys # 4 and # 6 limit the right-hand side of the approach channel.

On top of the pier, beginning at a point 139 feet from the southerly end and extending northward all the way to land, is a long rectangular warehouse constructed of steel girders and framing, with asbestos siding. The warehouse is 25 feet high and occupies more than half the width of the dock. On the western side of the warehouse are two railroad tracks extending the length of the pier. On the day of the collision, these tracks were occupied by two lines of railroad freight cars which ended at a point approximately adjacent to the southerly end of the warehouse.

2. *The Ship.* Fearnlee & Eger was and is a foreign corporation, partnership or unincorporated association, having a place of business in Oslo, Norway, and was the owner and operator of the M/V FERNVIEW on August 21, 1974.

The FERNVIEW is a Norwegian cargo vessel built in 1962, with an overall length of 577 feet and a deadweight tonnage (fully loaded) of approximately 11,000 tons. On August 21, 1974 she was en route from Boston to Searsport only partially loaded with a cargo of tapioca. Her draft was approximately 15′ 8″ forward and 23′ 6″ aft. The FERNVIEW has a single rudder, a single propeller and a single direct drive diesel engine, of approximately 11,300 horsepower, which is capable of driving the ship at a maximum speed of 18 knots. The ship's pilothouse is located amidships approximately 290 feet from the bow. The pilothouse is approximately 65 feet above the water, and the bow is approximately 30 feet above the water.

On August 21, 1974 the FERNVIEW was equipped with a Model D 202 Decca radar and a Model RM 426 Decca radar, together with a VHF radio, all of which were installed in the pilothouse and were in good operating condition.[3] The FERNVIEW carried navigational charts, including one of the Searsport Harbor area, and a speed log, but the charts and speed log dial were located in the chart room and were not used during the approach to the BAR pier. The ship's clock in the pilothouse did not have a second hand, jumped forward every half minute, and could only be read to the nearest minute.

3. *The Pilot.* William E. Abbott, a Penobscot Bay pilot, was the pilot of the FERNVIEW on the morning of August 21, 1974, having joined the ship in Boston the previous evening. Captain Abbott, a native of the Penobscot Bay area, attended the University of Maine at Orono and is a graduate of the Maine Maritime Academy. After serving in the Merchant Marine for a short period, Abbott returned to Belfast in 1946 and apprenticed as a Penobscot Bay and River pilot under his father. He earned his pilot license for Searsport Harbor and the BAR dock in 1952. Between 1952 and August 21, 1974, he had piloted approximately 4,000 ships in or out of Penobscot Bay, including approximately 1,000 into Searsport Harbor. Of the 1,000 ships piloted into Searsport, about half were diesel-powered cargo vessels similar to the FERNVIEW. Approximately 100 of the dockings at the BAR pier had been under reduced visibility conditions.

4. *The Ship's Personnel.* On the bridge of the FERNVIEW during the approach to the BAR pier were, in addition to Captain Abbott, the ship's master, Captain Vage,

---

**2.** The true heading of the pier is approximately 342°/162°.

**3.** Both radar antennas were located amidships on a mast directly over the pilothouse. The RM 426 antenna was located 30 meters above the water line and 23 meters above the main deck; the D 202 antenna was located 27 meters above the water line and 20.5 meters above the main deck. Each radar had a minimum range substantially less than the distance from the radar mast to the ship's bow, and each was capable of displaying the ship's bow as a target, which would be located approximately 0.6 inches from the center of the scope when set on the half-mile scale. The RM 426 had a range accuracy of plus or minus 50 yards, but could discriminate between objects located at least ten yards apart in range, provided that each object was at least ten square meters in size. The bearing accuracy of the RM 426 was plus or minus one degree.

First Officer Thorvaldsen and the quartermaster-helmsman. During the docking maneuvers, Chief Officer Wikeroy was forward on the bow, acting as lookout. Wikeroy maintained communication by walkie-talkie radio with Thorvaldsen. Captain Vage had been to sea since before 1938, had served as master on ships since 1954 and held a master mariner's license. Prior to August 21, 1974, he had made several trips into Searsport Harbor. Wikeroy and Thorvaldsen were both experienced and duly licensed.

5. *I.T.O.* I.T.O. Corp. of New England, a stevedoring corporation with a place of business at Searsport, Maine, as the terminal operator under contract with BAR, was to unload the FERNVIEW once it had docked at the BAR pier on the morning of August 21, 1974. Four longshoremen had been ordered to report to the pier at approximately 0600 to handle the lines as the FERNVIEW landed. Four gangs of longshoremen were to report to the pier shortly before 0800 to unload the vessel. The FERNVIEW's estimated time of arrival was 0800. I.T.O.'s general manager at Searsport was Hartley Fraser, since deceased. ·

6. *Delta.* Delta Chemical, Inc. was and is the owner and operator of a chemical sulfuric acid manufacturing plant located on the shore of Penobscot Bay in Searsport approximately 1.3 miles northeasterly of the BAR pier.

### Navigation of the FERNVIEW

7. Captain Abbott joined the FERNVIEW in Boston at 1500 on August 20. The ship was scheduled to depart Boston at 1700, but because of a delay in loading did not leave until about 1930. Abbott had never piloted the FERNVIEW, nor had he ever met Captain Vage or any other of the ship's officers. Abbott slept until shortly before he assumed his pilotage at approximately 0410 on August 21 at Buoy # 14–M, two miles west of Monhegan Island. Short-

ly after he took over, Abbott learned that the ship had been running at reduced speed, because of poor visibility, during the night. He knew that on mornings when a ship was due at the BAR pier, it was customary to have linesmen standing by at 0600 and to have the cargo handlers ready by 0800. Abbott was anxious to dock the vessel between 0730 and 0800, both to avoid "detention" charges levied by the stevedoring company when a ship is late and to take advantage of the slack tide, which would occur at 0715. At Monhegan the visibility was what Abbott categorized as "open and shut" (ranging from 3–4 miles to 5–6 miles). The radar was running and tuned.

8. From Monhegan to Islesboro the FERNVIEW made full sea speed of 15–16 knots. At 0706[4] the ship passed Buoy I–I (Islesboro), 4.5 miles from the BAR pier, on a course of 017–018°. Although Abbott's practice was to begin reducing speed at Buoy I–I, on this occasion he did not do so until "approaching Sears Island" eight minutes later at 0714, when he order "half ahead." Almost immediately thereafter he ordered "dead slow ahead." From Buoy I–I to the pier there was no wind, the sea was calm, and the tide was almost dead low.

At Buoy I–I Abbott explained to Captain Vage the two methods of docking a ship at the BAR pier. One method is to approach the end of the pier on a northeasterly course on a slightly oblique angle so that the port side of the vessel makes contact with the southeast corner, or "knuckle" of the pier, and then work the ship around the knuckle with the aid of mooring lines. The other method is to swing wider to the east during the final approach and then adopt a more northerly course so as to bring the vessel parallel with the east side of the pier. Abbott told Vage at this point that he intended to use the latter "quicker" approach, because there were four gangs of longshoremen ordered for 0800.

9. At approximately 0717, as the FERNVIEW approached Buoy # 2, Abbott or-

---

4. Unless otherwise noted, the times recorded in these findings are bridge clock times, supplemented by oral testimony.

dered the engines stopped. From 0717 until 0727, the ship was coasting. At 0720 the FERNVIEW passed 0.6 miles west of Buoy # 2. Her heading was 017–018°, but her speed was unknown. The weather at this time was clear and sunny. From Buoy # 2 Abbott could see the Searsport town dock to the west and Sears Island to the east, but because of the haze he could not see Buoys # 5 and # 6 and the BAR pier ahead.

10. Shortly thereafter the FERNVIEW passed 0.1 miles west of Buoy # 4.[5] When he passed Buoy # 4 Abbott could still see the Searsport town dock 1.5 miles to the west and the tree line of Sears Island 0.8 miles to the east, but he could not see the BAR dock or Buoys # 5 and # 6, which were obscured by haze.

At Buoy # 4 Abbott began conning the ship by radar, using the larger (RM 426) radar at the rear of the pilothouse.[6] He also sent Chief Officer Wikeroy to the bow to act as a lookout. The hazy conditions ahead of him did not give Abbott undue concern, since fog of varying density is common along the Maine coast, particularly in Penobscot Bay, and in the past he had frequently docked vessels in foggy conditions. Prior to the accident, Abbott had always enjoyed from 200 to 300 feet of visibility at the dock and assumed he would do so on this day.

11. As the FERNVIEW traveled between Buoys # 4 and # 5, Abbott, with Vage's concurrence, changed his docking plan, abandoning the parallel approach in favor of "working the knuckle." When the ship was abeam of Buoy # 5, 0.5 miles from the pier, Abbott adjusted his radar to the half-mile scale. At this point the ship was in a haze, which became more dense between Buoys # 5 and # 6.

12. At about 0727 the FERNVIEW drew abeam of Buoy # 6, about 0.3 miles (1800 feet) from the BAR pier.[7] The ship passed 300–600 feet west of Buoy # 6 on a heading of 005°. At that time Abbott ordered the engine to "dead slow ahead." [8]

13. At about 0729, in accordance with his usual practice, when the FERNVIEW was about one ship's length (500–600 feet) from the pier,[9] Abbott ordered the engines stopped and the starboard anchor dropped one shackle to act as a brake and give good control of the ship.[10] Abbott then steadied the FERNVIEW up by radar on a course which, he believed, would cause the ship to pass just clear of the southeast knuckle.[11] Having done so, he told the helmsman to maintain a steady course and, accompanied by Vage, went out onto the starboard wing of the bridge to check the ship's speed through the water. Observing the surface of the water (65 feet below the bridge), Abbott estimated the ship's speed at one

5. There is no record of the time of passage.

6. While Abbott was using the larger radar, Vage occasionally consulted the smaller (D 202) radar.

7. The Court rejects Abbott's testimony that as he approached Buoys # 5 and # 6 he had a telephone conversation with his wife concerning visibility conditions at the pier. See Discussion, infra.

8. As previously indicated, the ship had been coasting from Buoy # 2 (0720) to Buoy # 6 (0727), a distance of 1.3 miles, which it had covered in seven minutes for an average speed of about 11 knots. Abbott did not know the ship's speed at 0727, nor could he recall the reason for ordering an engine movement of "dead slow ahead," which, he testified, was not necessary to gain steerageway.

9. If, as Abbott testified, the FERNVIEW traveled from Buoy # 6 (1800 feet from the pier) to a point 600 feet from the pier during the two-minute period from 0727 to 0729, the FERNVIEW apparently covered 1200 feet in two minutes for an average speed of six knots.

10. Abbott estimated the distance of the ship's bow from the pier (600 feet) from his observation of the radar. When, however, he was asked in the courtroom to indicate graphically what he saw in the radar scope, Abbott placed the bow of the ship only 450 feet from the end of the pier. Specifically, he depicted the end of the pier almost exactly 1.5 inches from the center of the radar scope, which would represent a distance of 750 feet from the radar mast, but only 450 feet from the ship's bow.

11. It is probable, however, that Abbott had targeted the radar on the southeast corner of the warehouse rather than the southeast knuckle of the pier. See Discussion, infra.

knot (100 feet per minute); Vage believed that the ship was nearly dead in the water. At this time, the sun was shining, Abbott could see the "after end of the forecastle" but he could not see Sears Island to starboard. Despite the reduced visibility conditions, Abbott was confident that if he could see the after end of the forecastle, approximately 200 feet from the bridge, the mate in the bow could see at least an equal distance ahead of the ship. Neither Abbott nor anyone else on the bridge inquired of the lookout nor received information from him concerning the ship's speed or distance from the dock, the visibility conditions or how the anchor was tending. By this time, Abbott had abandoned the radar and was relying on the lookout as the "eyes" of the ship.

14. From the starboard wing of the bridge Abbott and Vage returned to the pilothouse. Meanwhile, the four I.T.O. linesmen on the pier were banging on an outbuilding and making noises so as to alert the ship as to the position of the end of the pier, where they estimated the visibility to be ten feet or less. For two or three minutes before the collision occurred, these linesmen could hear voices on the ship.[12] The mate in the bow heard this banging and shouting at the end of the pier and reported these noises ahead to the bridge just before the ship reached the pier. One or two minutes later, the mate sighted the pier 20-30 feet ahead and shouted over the radio to the bridge, "Full ahead astern." This ambiguous order somewhat confused Abbott. He had to pause to "digest" it and finally ordered, "Slow astern" at 0734.[13] At the time he gave the "slow astern" order Abbott looked up and saw the pilothouse was engulfed in a white cloud and visibility was zero.

15. The bow of the FERNVIEW collided with the end of the pier at 0735. The ship's bow ultimately penetrated the end of the pier at a slight angle at a depth of approximately 50 feet.[14]

### Events at the BAR Pier

16. Between approximately 0600 and 0615 on the morning of August 21, Elwood A. Stantial, Daniel Rich, Warner C. Hamilton, and Raymond Hamilton, since deceased, longshoremen employed by I.T.O. who were to handle the lines during the docking of the FERNVIEW, arrived separately at the BAR pier. The men gathered in the "bullpen," a waiting room for longshoremen at the northerly, or land, end of the pier, pending arrival of the vessel. As the men reached the pier and proceeded to the bullpen, they encountered an extremely thick, white fog.

17. On the easterly side of the bullpen was a window which one of the linesmen opened. Fog poured into the bullpen through the window, and shortly thereafter the men experienced breathing difficulties. Stantial also suffered eye irritation. The men obtained some relief when they shut the east window. Unlike ordinary fog, the fog which entered the bullpen and caused the men respiratory problems and eye irri-

---

12. *See Findings of Fact, Events at the BAR Pier, infra.*

13. Abbott testified that in his opinion, given the relatively high horsepower of the FERNVIEW, a "slow astern" bell to the engine room could have stopped the ship within 20 to 30 seconds. Later in the trial he stated that he believed he could stop the FERNVIEW in 25 to 30 feet.

14. It is not clear whether all of the damage to the pier occurred in the initial thrust or while the vessel was "rummaging around in the pier" for some period of time after the initial collision. The bell log shows that the engine was stopped at 0735, and from 0735 to 0755 approximately 20 different engine orders were given, the notation for 0755 being that the ship "backed out of pier." Abbott explained this series of commands as reflecting his efforts to dock the FERNVIEW after she had backed free from the point of collision, and that the 0755 bell log notation recorded not the backing of the vessel out of the damaged area, but the backing of the vessel out of the water east of the dock into the anchorage. Abbott testified that after unsuccessfully attempting to dock the vessel he had decided to wait in the anchorage for better visibility, when he suddenly saw the east side of the dock and was able to land the FERNVIEW without further difficulty.

tation bore a distinctive pungent odor.[15] While in the bullpen, the men were visited by Harold Garcelon, the BAR night watchman, who reported that the fog was very dense at the end of the pier.[16]

18. At approximately 0630–0645, the linesmen heard the FERNVIEW whistle and proceeded to the end of the pier through the warehouse. During their walk through the warehouse, the men continued to experience respiratory difficulties.[17] The men exited from the far end of the warehouse onto a raised ramp which ran down the east side of the pier and stopped about 10–12 feet from the southeast knuckle. The ramp stood approximately five feet above the pier decking. Adjacent to the edge of the ramp, and resting on the pier decking near the southeast knuckle was a small shed. The men waited for the FERNVIEW on the end of the ramp, about five feet from the easterly edge of the pier.

19. The fog at the end of the pier was dense. Visibility was restricted to approximately 10 feet. Wind conditions were calm.

20. As the linesmen waited for the ship to arrive,[18] Warner Hamilton, at the request of Herbert Morse, another I.T.O. employee who had joined the group on the ramp, began to hammer intermittently against the shed located at the end of the ramp so that the ship could learn the location of the pier.[19]

21. While on the ramp, after the hammering began, the linesmen heard voices from the FERNVIEW. Someone on the ship shouted to the dock to inquire if the men on the dock could see or hear the ship. Rich and Warner Hamilton[20] shouted, "No." Approximately 10 to 15 seconds later, the bow of the vessel broke through the fog 10 feet or less from the edge of the pier. Stantial yelled, "Full astern," as he and the others ran up the ramp away from the oncoming ship.

### Events at Delta Chemical, Inc.

22. The Delta facility at Searsport consists of two separate sulfuric acid manufacturing plants, plant # 1 and plant # 2, each of which produces sulfuric acid through the "contact" process.

23. In the final stage of the contact manufacturing process sulfur trioxide ("$SO_3$"), a colorless gas which bears a slightly pungent odor, is pumped into the bottom of an "absorber." The absorber consists of a tower packed with rashig rings which increase the contact surfaces within the tower. As $SO_3$ enters the bottom of the absorber and is forced upward, a strong solution of sulfuric acid, a liquid, enters at the top of the absorbing tower and trickles downward. The $SO_3$ mixes with water in the acid solution to form additional sulfuric acid, which is drawn off and stored as the product of the plant.

24. The $SO_3$ which enters the absorber is only about 98% pure and contains residues of sulfur dioxide ("$SO_2$"), a colorless yet extremely pungent gas which smells

---

15. Rich likened the smell of the fog to burning sulfur, and Warner Hamilton stated that the odor of the fog resembled the smell given off by a match which has just been struck.

16. Following his chat with the linesmen, Garcelon completed his "wind," the last of his shift, at approximately 0630 and left his watchman's report under the door of Oden Gradie's office. Gradie was the BAR special agent in charge of the pier. Garcelon did not see Gradie that morning and did not mention the fog to him.

17. Stantial also experienced eye irritation. Both Stantial and Warner Hamilton found it necessary to cover their faces with handkerchiefs in order to breathe.

18. On the ramp, the linesmen were joined by Jon Gradie, the BAR day watchman who had relieved Garcelon at approximately 0630. Jon Gradie is the son of Oden Gradie.

19. Although the FERNVIEW claims that Hartley Fraser was the ultimate source of the order to pound the shed, no credible evidence exists to substantiate that allegation. Moreover, with respect to the question of I.T.O.'s liability for the collision as a result of the hammering, it is immaterial who actually gave the order. *See Discussion, infra.*

20. By this time Raymond Hamilton, a union shop steward, had returned to the bullpen to organize the unloading crew.

**1052**

like burning sulfur,[21] and oxygen, and nitrogen, both odorless and colorless gasses.

25. Under standard operating conditions a certain amount of $SO_3$ does not mix with the sulfuric acid solution in the absorber, but instead passes through the absorbing tower and out the stack into the atmosphere. In addition to the $SO_3$, the residues of $SO_2$, oxygen, and nitrogen contained in the $SO_3$ normally pass through the absorbing tower and are emitted from the stack.[22]

26. Though colorless itself, $SO_3$, when emitted from the stack, combines with moisture in the atmosphere to form sulfuric acid mist, or, as it is known more commonly, acid mist. Acid mist is visible, appears white like ordinary water vapor, and is heavier than air. Acid mist is slow to disperse under foggy or humid conditions because fog and humidity tend to entrap it. Fog and humidity also hamper the dispersion of $SO_2$ which, like acid mist, is heavier than air.

27. The optimum concentration of the sulfuric acid solution pumped into the top of the absorbing tower is 98.5% to 98.8% sulfuric acid by weight. The remainder is water. If the strength of the acid solution exceeds 98.8%, the efficiency of the conversion of $SO_3$ into sulfuric acid decreases and the amount of $SO_3$ emissions passing through the absorbing tower and out the

stack correspondingly increases. The other emissions, $SO_2$, oxygen and nitrogen, remain unchanged and continue to pass out the stack.

28. The concentration of the sulfuric acid solution entering the absorbing tower is recorded on a graph by a "98% acid recorder."[23] The 98% acid recorder thus enables plant operators to monitor the strength of acid solution pumped to the absorber. On the basis of data yielded by the recorder, plant operators increase or decrease the strength of the sulfuric acid solution as conditions may warrant. The sulfuric acid solution must be adjusted continually in order to maintain the proper acid strength.

29. The normal operating life of a 98% acid recorder varies from ten to twenty years. The recorder in use in Delta plant # 2 during all times material to the present litigation was eighteen years old. In the week preceding August 21, 1974, the recorder for plant # 2 was repaired or recalibrated on at least five occasions.[24] Prior to August 21, Delta had available in stock a new 98% acid recorder with which it could have replaced the recorder for plant # 2.

30. Delta plant # 2 was in continuous operation on August 20–21, 1974 until 0710, August 21.

31. At approximately 0030 on August 21 Randall Blake, the "A" operator for plant

21. Unlike $SO_3$, $SO_2$ is irritating to the eyes and the respiratory system of those exposed to it. Only 20 parts per million (hereinafter "ppm") of $SO_2$ in the atmosphere is sufficient to cause eye and throat irritation in the average person.

22. A normal stack emission occurring when all aspects of the contact production process function properly is composed of 2000 ppm of $SO_2$, .02% $SO_3$, 13% oxygen, and small amounts of nitrogen.

23. A 98% acid recorder is a measuring device and does not itself control the production process. The recorder operates by means of sensing cells located in the pump tank through which the sulfuric acid solution is pumped into the absorber. To calibrate the recorder, plant operators periodically must make manual "dilution" tests of acid strength and then synchronize the recorder appropriately. An individual manual test takes about fifteen minutes to perform, and at least two such tests should be

taken and averaged in order to assure an accurate measurement. The recorder for plant # 2 was located on an instrumentation board about 100 feet from the absorber.

24. Eugene Palmer, an electrician and instrument technician with Delta whose duties included maintenance of the 98% acid recorders, worked on the recorder for plant # 2 on August 14, 15, 16, 18 and 20, 1974. On August 14, he reset and cleaned various parts of the recorder and recalibrated it to conform with readings obtained from manual dilution tests. On the following day, August 15, he again recalibrated the recorder. On August 16, Palmer replaced the recorder's sensing cells and adjusted the new cells to correspond with dilution test results. On August 18 he readjusted the new cells, and on August 20, he readjusted the cells and recalibrated the recorder.

# 2 observed that the plant's 98% acid recorder had begun to malfunction.[25] The recorder continued to malfunction throughout the early morning hours of August 21 and ceased to measure accurately the concentration of the sulfuric acid solution which entered the absorber.[26] Without benefit of the information provided by a fully operational recorder, the plant in effect was "flying blind" from approximately 0030–0100 onward.[27] However, at no time after Delta personnel had become aware of the malfunction were instrument technicians called in to repair the recorder.

32. As a result of the recorder malfunction, the operators of plant # 2 permitted the strength of the sulfuric acid solution which was pumped into the absorber to creep above the optimum concentration of 98.5% to 98.8% sulfuric acid. Increased acid strength caused excessive amounts of $SO_3$ to escape from plant # 2 during the early morning,[28] along with the residual emissions of $SO_2$, oxygen, and nitrogen. The plant continued to produce excessive emissions until it was shut down due to these emissions around 0710.[29] The plant was not equipped with instrumentation capable of measuring the volume of emissions which passed through the stack during the period.

Hence, it cannot be determined precisely how much gas was emitted on August 21.[30]

33. Delta personnel had known of the repeated malfunctions of the 98% acid recorder for plant # 2 which had occurred in the days immediately preceding August 21 and had learned of the latest recorder malfunction approximately six and one-half hours before the plant was ordered shut down and approximately seven hours prior to the FERNVIEW's collision with the BAR dock.

34. Although both Bennett and Harry L. Burns, the shift supervisor who succeeded Bennett at 0630 on August 21, possessed the authority to shut the plant down because of excessive emissions, neither did so.

35. Upon entering the atmosphere, the excessive $SO_3$ emissions produced by plant # 2 reacted with moisture in the air to form clouds of acid mist. Some of this acid mist, along with the other emissions normally produced by the plant ($SO_2$, oxygen and nitrogen), were carried by winds southwesterly to the BAR dock. The acid mist to some degree contributed to and made more dense the preexisting natural fog which the FERNVIEW encountered during its attempt to land at the dock.[31]

25. In the operating summary which he maintained for plant # 2, Blake noted at 0100 on August 21, "98% recorder not reading right." Blake explained that it was his custom to date each entry one-half hour later, so that the 0100 reading actually reflected conditions at 0030.

26. Valmore W. Bennett, the shift supervisor at plant # 2 from 1100 to 0700 on August 20–21 testified that at approximately 0300 the recorder graph showed a jagged, erratic line rather than the steady, unbroken curve which is normally produced. Bennett interpreted the irregular graph to mean that the recorder had malfunctioned.

27. Ernest R. Hess, Jr., vice president and general manager of Delta, testified that, without an accurate 98% acid recorder, plant # 2 was "running blind" on August 21. Charles K. Sawyer, Delta's production superintendent during August 1974, similarly testified that the plant was "flying blind" following the breakdown of the recorder.

28. The Court rejects Delta's contention that, since two manual dilution tests taken sometime between 0100 and 0530, the results of which

were recorded in the Delta operating log book for plant # 2, showed the strength of the acid solution to have been 98.87% and 98.98% respectively, acid strength was within an acceptable range and little or no excessive emissions of $SO_3$ could have occurred. See Discussion, infra.

29. Ernest Hess ordered plant # 2 shut down immediately after he arrived at the Delta site and observed above-normal emissions emanating from the plant stack. The order was given at about 0710 and by 0730, the emissions had nearly ceased.

30. The FERNVIEW produced an expert witness, Charles H. Winter, Jr., who offered calculations purporting to demonstrate the approximate amount of acid mist escaping the plant. For reasons set forth in the Discussion, infra, the Court must discount substantially this expert testimony.

31. In finding that the acid mist produced by Delta plant # 2 reached the vicinity of the BAR dock and was a contributing element to

## 1054

### DISCUSSION

BAR contends that the sole proximate cause of the FERNVIEW's collision with its pier was negligent navigation of the vessel by her pilot and the ship's officers.[32] The basic claim of the ship, her owner and the pilot is that the navigation of the FERNVIEW was in accordance with the standards of good seamanship and that the sole proximate causes of the collision were negligence of BAR and I.T.O. in failing to warn the pilot of the reduced visibility condition at the pier and negligence of Delta in producing from its plant chemical emissions which obstructed visibility at the pier. BAR, I.T.O. and Delta each deny any fault which was a proximate cause of the collision. For the reasons to be stated, the Court concludes:

(1) That negligent navigation of the FERNVIEW by her pilot and the ship's officers was a proximate cause of the collision;

(2) That negligence of Delta in producing chemical emissions from its plant which obstructed visibility at the BAR pier was also a proximate cause of the collision;

(3) That no fault of BAR or I.T.O. was a proximate cause of the collision;

(4) That the collision was caused 80% by the negligent navigation of the FERNVIEW and 20% by the negligence of Delta.

### Fault of the FERNVIEW

◼ It is well established that a moving vessel and her owner are subject to the presumption of fault when the vessel strikes an obvious, or well-charted, stationary object, such as a dock. *The Oregon,* 158 U.S. 186, 197, 15 S.Ct. 804, 39 L.Ed. 943 (1895); *Freeport Sulphur Co. v. S/S Hermosa,* 526 F.2d 300, 302 n.1 (5th Cir. 1976). The presumption of fault "operates against all parties participating in the management of the vessel at the time of the contact."

*Merrill Trust Co. v. Bradford,* 507 F.2d 467, 470–71 (1st Cir. 1974), *citing International Terminal Operating Co. v. Naviera Aznar,* 198 F.Supp. 214, 217 (S.D.N.Y.1961). The presumption can be avoided only by proof that the stationary object was somehow at fault, or that the collision was "inevitable." *The Louisiana,* 70 U.S. (3 Wall.) 164, 173, 18 L.Ed. 85 (1886); *The Oregon, supra; Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790, 794 (5th Cir. 1977); Griffin, *The American Law of Collision* § 145, at 348 (1949). In the present case, it is undisputed that the BAR pier was an obvious and well-charted stationary object, and there is no suggestion that the pier itself could have been in any way at fault. Defendants contend that the collision was "inevitable" because it was caused by circumstances beyond the control of the pilot and ship's officers. *See The Louisiana, supra.* The evidence clearly establishes, however, that the handling of the FERNVIEW was faulty in several respects and the collision was by no means inevitable.

◼ The navigation of the FERNVIEW must be measured against the general requirements of good seamanship and due care. Gilmore & Black, *The Law of Admiralty* § 7–3, at 489 (2d ed. 1975). "The test is, could the collision have been prevented by the exercise of ordinary care, caution, and maritime skills." *The Jumna,* 149 F. 171, 173 (2d Cir. 1906); *see also* 33 U.S.C. § 221. The only expert testimony offered with respect to the seamanship of Captain Abbott and the FERNVIEW's officers was that of Captain David M. Kennedy, who testified on behalf of defendants. On his direct examination, Captain Kennedy stated his opinion that Captain Abbott's handling of the FERNVIEW conformed to the standards of prudent seamanship and was without fault. The record discloses, however, that the pilot and officers of the

---

the thick fog which enveloped the FERNVIEW, the Court necessarily rejects Delta's argument that, because of the prevailing wind observed at the Delta site at 0700 and earlier, it was impossible for the acid mist to have traveled to the BAR dock. *See Discussion, infra.*

**32.** The ship and her owner admit that the pilot, the captain and the other officers of the FERNVIEW were at all material times acting as their agents and servants.

FERNVIEW failed to meet the standards of good seamanship and due care as developed by Captain Kennedy, in his cross-examination, in the following respects:

(a) *Failure to keep track of the ship's position and speed.* Kennedy testified that it is essential that those in command of a ship know at all times its position, speed and heading. Because he would have done so himself, he assumed that Abbott was making these calculations as the FERNVIEW approached the pier. In fact, the evidence discloses that neither Abbott nor the ship's officers attempted to fix the ship's position on a chart or to use the radar for this purpose. Indeed, there was not even a chart in the pilothouse. The evidence further shows that between 0714, when Abbott ordered the engines "half ahead" and shortly after 0729, when Abbott and Vage attempted to estimate the ship's speed by observing the water from the wing of the bridge, no attempt was made to determine how fast the ship was moving. Kennedy conceded that it would have been prudent to determine the ship's speed during that period, especially in view of the fact that Abbott had delayed reducing speed for eight minutes beyond the point where he ordinarily would have done so. In this connection, it is significant that the vessel's speed was probably considerably faster than the one knot which Abbott estimated at about 0729 from the bridge wing.[33]

(b) *Failure of communication between Abbott and the ship's officers.* Kennedy testified to the importance of a close working relationship between the pilot and the master and of adequate communication between the bridge and the forecastle during docking maneuvers. In fact, possibly because of the language barrier, Abbott and Vage had almost no communication prior to the collision and, more importantly, the communication between the bridge and the forecastle was not only minimal but misleading. At 0729, when the FERNVIEW was about one ship's length from the pier and the fog was thickening, Abbott had abandoned the radar and was relying on Wikeroy in the bow as the "eyes" of the ship. Yet neither Abbott nor anyone else on the bridge inquired of Wikeroy, nor did Wikeroy volunteer a report, concerning the ship's speed or distance from the dock, the visibility conditions at the bow, or how the anchor was tending. Wikeroy failed to report the changing visibility as the bow penetrated the thick fog, nor did he report on his inability to see the water any more. His first communication, reporting the banging noises on the pier, came at the last minute; and his second communication, "Full ahead astern," was confusing and incorrect, causing Abbott to hesitate and compromise by ordering, "Slow astern."[34]

(c) *Concern about late arrival.* Kennedy testified that a pilot should be concerned only with the safe movement of his ship, without regard to shore considerations such as stevedore detention charges which might result from a late arrival. The evidence, however, plainly indicates that Abbott's navigation of the FERNVIEW was, to some extent at least, affected by the fact the ship was late and the longshoremen had

---

33. As has been previously noted, Abbott testified that at a speed of one knot with the starboard anchor dragging the FERNVIEW would come to a complete stop within 25–30 feet after a "slow astern" bell. If this testimony is accepted, and if the FERNVIEW was in fact making only one knot (and decelerating) a ship's length (600 feet) from the pier, then when Wikeroy first sighted the pier at a distance of 20–30 feet, there should have been time to bring the ship to a complete stop without hitting the pier. It also seems highly unlikely that the bow could have penetrated 50 feet into the pier if the ship's speed was only one knot as estimated by Abbott.

34. Kennedy admitted under cross-examination that the communication, "Full ahead astern" was ambiguous, but Kennedy also maintained that the command served its purpose of alerting the bridge to danger and that the commander of a ship should have known instantly that an astern order was required. As Kennedy's testimony indicates, either the communication was erroneous, causing Abbott to lose precious time as he interpreted the confusing message, or else Abbott's hesitation in ordering an astern bell was unwarranted. Either analysis demonstrates poor seamanship and the lack of communication between the forecastle and the bridge.

been called for 0800. Aware that the FERNVIEW had been delayed in departing Boston and had been running at reduced speed during the night, Abbott continued at full speed for eight minutes past Buoy I–I, the point where he would ordinarily have reduced speed. He also admitted that his reason for choosing to dock the vessel by "working the knuckle" was because this approach would permit a "quicker" docking. In addition, Abbott testified that the use of tugs to assist the FERNVIEW in docking was an option available to him, but that he was unwilling to incur the delay of three-quarters of an hour to two hours which would have resulted.

(d) *Failure either to stop or reduce substantially the FERNVIEW's speed during the final minutes before the collision.* Kennedy testified that one of the options available to Abbott and Vage, in their approach to the pier, was simply to stop, anchoring if necessary, and to wait for visibility conditions to improve. He testified that after dropping the starboard anchor when a ship's length from the pier he would have continued, as Abbott did, expecting to see the pier at any moment. But he conceded that when he received no word that the forward lookout had sighted the pier, he would have brought the ship to a dead stop before reaching the pier. He also admitted that it might not "always" be prudent to rely upon the fact that, as Abbott testified, regardless of fog conditions elsewhere, there had always been between 200–300 feet visibility at the end of the BAR pier.[35]

The prudence of Abbott's reliance upon his assumption that there would be 200 to 300 feet visibility at the end of the pier is subject to serious question. Abbott's testi-

mony that the visibility conditions at the pier on August 21 were unprecedented is contradicted by the testimony of Harold Garcelon, a watchman on the pier since 1964. Garcelon testified that he had seen heavy fog appear approximately ten times during normal summers, reducing visibility to between two and 50 feet. Abbott himself also admitted that fog of varying density is common along the Maine coast, often appearing very thick in one direction but not in another. But more significantly, even if it was prudent for Abbott to proceed as he did after dropping the anchor at 0729 when a ship's length from the pier, this does not justify his failure to stop the vessel before the collision. At the one-knot speed (100 feet per minute) estimated by Abbott, the vessel should have reached the pier in approximately six minutes. If, as Abbott assumed, Wikeroy had 200–300 feet of visibility at the bow, he should have anticipated that the lookout would report almost immediately that he had sighted the pier. Yet Abbott received no report whatsoever until about 0734, five minutes later. Plainly, his failure to drop the port anchor, to reverse the FERNVIEW's engines, or to take any other action to slow or stop the vessel (or even to inquire of the lookout as to whether the dock had been sighted), was less than prudent seamanship.[36]

(e) *Reliance on radar.* Kennedy testified that it is "imprudent" to con a vessel by radar at a range of less than 0.2 miles (1200 feet) from the radar antenna.[37] Yet, on his approach to the pier, Abbott relied on the radar until 0729, when the ship was only 600 feet from the pier. If Kennedy is correct in his opinion that the FERNVIEW's radars were unusable at a range of less

---

**35.** Kennedy generally supported Abbott in this factual contention, testifying that he had landed at the BAR pier approximately 100 times and there had always been at least 300–400 feet of visibility. He admitted, however, that he had not docked a ship at Searsport during the last seven years.

**36.** Moreover, at a speed of one knot, two or three minutes would have been required for the ship to have penetrated the thick fog at the pier all the way back to the pilothouse. During that time the changed visibility conditions should

have been readily apparent both to Wikeroy at the bow and to Abbott and Vage in the pilothouse. Yet, Abbott did not observe this condition, and neither Wikeroy nor Vage reported any such observation to Abbott.

**37.** Since the radar antenna on the FERNVIEW was located approximately 300 feet aft of the bow, the minimum range in which Abbott prudently could have relied on radar was 900 feet ahead of the bow.

than 0.2 miles, then Abbott's reliance on the radar at this close range was faulty seamanship.[38]

(f) *Misuse of radar.* Although Kennedy's testimony did not touch upon it, it also appears highly probable that a cause of the collision may have been that Abbott's radar was not picking up the southeast end of the pier, as he supposed, but rather the southeast end of the warehouse on the pier. For some unexplained reason, the FERNVIEW was seriously off-course; instead of grazing the knuckle, the bow struck the pier at a substantial distance to the left of the knuckle. There was no wind or current which might have deflected the ship from her course. There is no indication that the helmsman fell off to the left of the course which Abbott had given him before leaving the pilothouse to go out on the starboard wing. The specifications of the RM 426 radar show a bearing accuracy of one degree, and the evidence is that the radar was in good condition. The only other possible explanation is that Abbott had in fact set his heading flasher and his course for the southeast corner of the warehouse, which, Marden testified, because of its width, its height, and its steel and asbestos construc-

tion presented a much better radar target than the end of the pier.[39]

It further appears that Abbott had incorrectly adjusted the radar, since neither the ship's bow nor what he would have presumed to have been the warehouse were displayed on the radar scope. As Marden testified, the "sea return" control and other tuning mechanisms in the radar would have allowed Abbott to receive and to differentiate the bow and the warehouse, as well as the knuckle, had he properly tuned the radar set.

■ Being persuaded that the navigation of the FERNVIEW on her approach to the BAR pier did not meet the required standards of good seamanship and due care and that the evidence fails to establish any such "inevitability" of collision as to avoid the presumption of fault which arises when a moving vessel strikes a stationary dock, the Court holds that negligent navigation of the FERNVIEW was a proximate cause of the vessel's collision with the BAR pier.[40]

### Fault of Delta

■ It is well established that a manufacturer who negligently emits steam or other opaque gas which obstructs visibility

---

**38.** Conversely, if, as I.T.O.'s expert witness, Adrian S. Marden, a radar technician, testified, the accuracy range of the FERNVIEW's radars was much less than 0.2 miles, then Kennedy's credibility as an expert navigation witness is seriously impeached.

**39.** Marden's testimony was that the echo return from the warehouse would be more than 20 times as strong as that from the end of the pier. He also testified that the two railroad cars which were located flush with the end of the warehouse would further enhance the echo from that location. Finally, the location and angle of the cut which the ship's bow made into the end of the pier, as depicted in numerous photographs, indicate that the ship would have made a nearly perfect landing on the southeast corner of the warehouse.

**40.** In collision cases, where a ship has violated a safety statute or regulation, the ship is presumed to have been at fault; and in order to escape liability the ship must show not only that the violation did not cause the collision, but also that it *could not* have caused it. *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874). Bar, I.T.O. and Delta rely

also on this presumption, which is separate and independent from the presumption of fault when a ship strikes a stationary object. They assert the FERNVIEW violated the Inland Rule of the Road which provides, *inter alia*:

> Every vessel shall, in a fog . . . go at a moderate speed, having careful regard to the existing circumstances and conditions.

33 U.S.C. § 192. *See also* 33 C.F.R. § 80.13(a). Although the rule does not in terms require a ship to reduce speed before she is in a fog, the courts have held that she must begin reducing speed so that her speed will be moderate "the moment she is in it." *The City of Alexandria,* 31 F. 427, 431 (2d Cir. 1887); *see also The Silver Palm,* 94 F.2d 754 (9th Cir. 1937); *Griffin, supra,* § 121 at 306. In view of the Court's conclusion that the FERNVIEW has made no showing of inevitability such as to overcome the presumption of fault arising from the striking of a stationary object, it is unnecessary for the Court to reach the question of whether the ship is subject to the further presumption of fault because of violation of the foregoing safety rule.

on public highways, airways, or waterways is liable for damages proximately caused by such negligent emissions. *Lavelle v. Grace,* 348 Pa. 175, 34 A.2d 498, 500–01 (1943); *Restatement (Second) of Torts* § 37 (1965); *see Eastern Airlines, Inc. v. American Cyanamid Co.,* 321 F.2d 683 (5th Cir. 1963); *In re M/S Pacific Carrier,* 489 F.2d 152 (5th Cir.), *cert. denied,* 417 U.S. 931, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974). The FERNVIEW alleges that Delta negligently caused the excessive emissions of $SO_3$ which reached the BAR pier and that the emissions substantially intensified whatever natural fog existed at the pier, thereby constituting a proximate cause of the collision.

Delta does not dispute the FERNVIEW's general legal contention that, if it negligently caused the emissions of $SO_3$, and if such emissions were a proximate cause of the accident, it would be liable under standard tort doctrine, but rather challenges the ultimate factual predicates upon which such liability must rest. While conceding both that the 98% acid recorder for plant # 2 malfunctioned shortly after midnight on August 21 and that above-normal emissions were produced by the plant during the early morning hours of August 21 prior to the time of the collision, Delta attempts to characterize as de minimis the extent to which the emissions exceeded normal operating emissions and vigorously questions whether, as an atmospheric or meteorological phenomenon, any significant quantity of acid mist could have reached the BAR pier.

In its effort to minimalize the amount of acid mist which plant # 2 could have produced, Delta relies heavily on the results of four manual dilution tests which Randall Blake took between approximately 0030 and 0530 on August 21. The first test,

Blake testified, revealed the strength of the acid solution to be normal. The final test yielded an acid concentration of 98.8% or 98.9%, which Blake also considered to be normal. The second and third tests, and the only dilution tests which Blake recorded in the operating log book for plant # 2, registered acid strengths of 98.87% and 98.98% respectively. This data pattern, Delta asserts, indicates that acid strength, and thus $SO_3$ emissions, were only slightly above normal. To buttress its conclusion, Delta notes that Blake and Bennett made several visual inspections of the stack during their shift. Each reported stack emissions to be "slightly above normal."

Delta's argument is unpersuasive in several respects. First, as two of Delta's senior operating personnel, Hess and Sawyer, testified, the maximum concentration of acid solution permitting the most efficient conversion of $SO_3$ into sulfuric acid is 98.8%. Acid strength above that level decreases conversion efficiency and increases the amount of $SO_3$ emissions. Yet, the only two manual dilution tests recorded in Delta records revealed the strength of the acid solution to have exceeded this optimum range. Blake's last test showed acid strength to be at the upper limit of the desired concentration, if not in excess thereof. Moreover, a fifth dilution test conducted around 0700 yielded acid strength of 100.4%.[41] This latter figure was the highest reading of acid strength that Sawyer had ever seen, despite some 30 years devoted to the production of sulfuric acid.[42] The various dilution tests demonstrate that during the early morning hours of August 21, acid strength repeatedly exceeded recommended operating levels, and in some cases substantially so.[43] Excessive acid strength led to

---

**41.** Acid solution of this concentration is known as "fuming acid." The 100.4% result meant that the solution was 100% sulfuric acid and 0.4% $SO_3$.

**42.** Although the precise accuracy of the test result may be questioned since only one measurement was taken instead of the recommended two, the test nonetheless persuasively indicates that the strength of the acid solution was considerably greater than 98.8%.

**43.** Delta's reliance on the visual inspections by Blake and Bennett likewise is misplaced. Both men viewed stack emissions in the dark, with only the aid of ground lights located around the Delta facility. Their ability to observe accurately the volume of stack emissions under such conditions must be seriously questioned. In addition, their description of the emissions

considerably above-normal emissions of $SO_3$ which, upon reaching the atmosphere formed acid mist.[44] Delta's efforts to depict the strength of the acid solution, and, therefore, the level of $SO_3$ emissions emanated from plant # 2, as acceptable, or only slightly above normal, must fail.

Equally unpersuasive is Delta's assertion that wind conditions made it impossible for significant amounts of acid mist to have reached the BAR pier. Delta places heavy emphasis on the testimony of Blake and Bennett, who stated that when they observed the stack emissions during the early morning hours, wind conditions were calm and the emissions passed straight up upon leaving the stack. Blake also testified that at 0500 and again at 0600–0630, fog was drifting over the Delta site from the south or southwest. These observations would indicate that the fog, and, hence, the wind were heading in a direction away from the BAR pier at that time. Delta also cites in support of its position the testimony of Hess and Sawyer, who around 0700 viewed both the fog and the Delta emissions blowing toward the town of Stockton Springs and away from the pier.[45] Finally, Delta notes that sometime after 0700, Delta received two telephone calls from people in Stockton Springs complaining of air pollution and eye irritation.

Delta's evidence with respect to wind direction is conclusively met by log entries in the operating summary for plant # 2 and by the uncontested statements of the longshoremen. The sole written record of wind direction consists of two entries which Blake made in the plant operating summary at 1130 and 0330 on August 20–21.[46] The first reading reported the wind from the north, the second, four hours later, from the east. Contrary to the inferences which Delta seeks to draw from the trial testimony of Blake and Bennett, the operating summary entries clearly demonstrate that wind

as only slightly above normal is undercut by the testimony of Hess and Sawyer, who, with the benefit of daylight observation, concluded that stack emissions were heavy. Indeed, Hess thought that the emissions were excessive enough to warrant shutting down the plant, a costly procedure. If, on the other hand, Blake and Bennett were correct in their description of the stack emissions, then the observations of Hess and Sawyer indicate that acid strength was increasing significantly and had not remained consistently within the recommended operating range, in direct contrast to what Delta suggests the manual dilution tests prove.

**44.** Because the Delta plant was not equipped with devices capable of measuring or recording the volume of gas escaping the stack, it is impossible to determine precisely how much acid mist was produced. by the plant. The FERNVIEW offered an expert witness, Charles Winter, who testified that following the recorder malfunction, $SO_3$ passed through the stack at Delta plant # 2 at the rate of 0.5 lbs./second or 1800 lbs./hour. Winter also testified that in his opinion the mist at the BAR pier was a direct result of events which occurred at the Delta plant. Winter's conclusions, however, were based on several critical assumptions which included material facts disputed by the parties. To calculate his rate of emissions, he "worked backwards" from the BAR pier and arrived at a figure of $SO_3$ emissions which, he claimed, would cause the respiratory problems which the longshoremen suffered. This approach forced Winter to assume that acid mist, and not $SO_2$, caused the longshoremen's difficulties, that the acid mist came from the Delta plant, and that wind velocity, direction and turbulence were such as to assure the maximum concentration of acid mist at the pier. Under cross-examination, the arbitrary nature of these assumptions became apparent. For example, Winter conceded that he could not offer a sound explanation of why he theorized that the longshoremen's respiratory ailments were caused by acid mist rather than $SO_2$. Other testimony presented in the case, though, strongly supports a contrary conclusion. The uncontested evidence established that $SO_2$ is much more toxic than acid mist and that acid mist usually does not cause eye or lung irritation of the type experienced by the longshoremen.

In sum, Winter's conclusions can only be interpreted as hypotheses predicated on assumption of the very facts which his testimony was submitted to prove. The Court cannot consider reliable his estimate of the amount of $SO_3$ escaping from the Delta plant.

**45.** Stockton Springs lies 2 to 2.5 miles to the northwest of the Delta plant, whereas the BAR pier is about 1.3 miles to the southwest of the plant.

**46.** The entries themselves were timed in the operating summary at 0100 and 0400, but, because of Blake's custom of entering data one-half hour later, actually were made at 1130 and 0330.

movement did occur prior to the time that Blake observed fog drifting in from the southwest [47] and that such winds were from the north and east. These wind headings, of course, were sufficient to carry Delta emissions to the BAR pier.

That the wind in fact carried Delta emissions to the pier is supported directly by the unimpeached testimony of the I.T.O. longshoremen, which strongly indicates that they were exposed to Delta emissions. The longshoremen consistently stated that shortly after 0600 a thick, noxious fog blew into the bullpen waiting room at the land end of the pier through the open east window. When the east window was closed, the fog stopped entering the room. The fog thus originated from the northeast quadrant, the location of the Delta facility. The dense fog caused the men respiratory and eye irritation while they were in the bullpen, in the warehouse, and on the end of the pier at the time of the collision.[48] As Delta's own witnesses testified, residual $SO_2$ always is emitted from the plant, even under normal operating conditions, and $SO_2$ likely was the cause of the longshoremen's respiratory difficulties.[49] Because Delta

has introduced no credible evidence to establish an alternative source of $SO_2$ that could have caused the fumes at the end of the pier, and because prevailing winds that existed during the early hours of the morning were precisely those which would have blown emissions from the Delta plant to the BAR pier, the most probable conclusion is that the longshoremen were exposed to Delta emissions composed both of $SO_3$ and $SO_2$. The $SO_3$ caused the acid mist and the $SO_2$, entrapped in the acid mist, caused respiratory irritation. The emissions contributed to and made more dense the preexisting natural fog which the FERNVIEW encountered and constituted a proximate cause of the collision. *See E. Rauh & Sons Fertilizer Co. v. Shreffler*, 139 F.2d 38, 40–41 (6th Cir. 1943).

■ Delta's negligence in allowing the excessive emissions to escape the plant is manifest. Delta was aware that the 98% acid recorder for plant # 2 was old and that it had malfunctioned frequently in the week preceding the collision. Although Delta had on hand prior to August 21 the

47. Blake's trial testimony that wind conditions remained calm until 0500 or 0600 is further contradicted by his description of an unusual configuration of the emission plume which occurred during his shift. At approximately 0100, Blake noticed that, although the emissions generally passed straight up from the stack, the emissions plume was split into a "V" shape. Blake theorized that wind turbulence could have caused the phenomenon. If sufficient winds existed to blow the emissions plume into an unusual and distinct shape, wind conditions obviously were not calm.

48. Delta points to the fact that Harold Garcelon, the night watchman for the railroad, encountered thick fog but no respiratory ailments during his 0430 and 0630 "winds" down the pier. Jon Gradie, his successor, likewise experienced thick fog but no respiratory difficulties. Garcelon and Gradie, however, were not exposed to the fog for the same extensive period as were the longshoremen, and their testimony is not inconsistent with the longshoremen's reports of the ill effects which the fog caused.

49. To substantiate its claim that events at plant # 2 could not have contributed to the collision, Delta presented the testimony of Dr. Max L. Spealman, who appeared as an expert witness. Spealman testified that because *excessive*

emissions produced by Delta would have consisted of acid mist and not $SO_2$, because the longshoremen suffered from exposure to $SO_2$ and not acid mist, and because of the testimony of Delta personnel concerning prevailing wind conditions, it was unlikely that the upset at plant # 2 had any effect on the collision. Spealman's opinion, however, fails to account for several factors which establish that Delta was the source of some of the fog at the pier. For instance, as he himself stated, $SO_2$ always is a by-product of the plant; $SO_2$ emanated from the stack along with excessive amounts of $SO_3$, which became acid mist. The assumption that the longshoremen suffered from $SO_2$ accordingly does not exonerate Delta, since the plant produced both acid mist and $SO_2$. Spealman's opinion ultimately rests on his belief that winds would have carried any emissions from the plant in the opposite direction of the BAR pier. Spealman, who is a chemist and not a meteorologist, based this aspect of his testimony on evidence the weight of which the Court must discount substantially, as is discussed at length, *supra*. Spealman's testimony, therefore, does not establish that the Delta plant was not the source of the irritating fog at the BAR pier.

necessary equipment with which to replace the recorder, and despite the fact that Delta personnel fully realized that running a sulfuric acid plant without a reliable recorder was tantamount to "flying blind," [50] Delta failed to replace the recorder. The multiple hazards of not replacing a worn and inaccurate recorder were reasonably foreseeable; Delta was negligent in not so doing. *Lavelle v. Grace, supra.*

Following the recorder malfunction at approximately 0030 on August 21, Delta failed to take appropriate actions which would have alleviated the dangers stemming from the malfunction. Between 0030 and 0500, Delta personnel conducted merely four manual dilution tests to determine the strength of the acid solution. But as Hess acknowledged, the proper practice should have been for the plant operators to have taken a dilution test every 15 minutes during the period in which the 98% acid recorder was not functioning. Only in this manner could the operators have assured that the concentration of the acid solution would not exceed the 98.5%–98.8% range. By failing to monitor acid strength closely, Delta breached the standard of reasonable care under which it was obligated to operate its facility. *Lavelle v. Grace, supra; cf. Foley v. H. F. Farnham Co.,* 135 Me. 29, 188 A. 708 (1937). Moreover, even though Delta personnel learned as early as 0100 that some degree of excessive emissions were being produced, no instrument technicians were called, the plant was not shut down until 0710 and no notice was ever given to the United States Coast Guard, the Maine State Police, or other authorities who could have taken appropriate steps to warn users of public waterways and highways of possible reductions in visibility due to the emissions. These omissions were substantial; Delta was negligent in failing either to alleviate the hazard or to issue appropriate warnings. *Simonsen v. Thorin,* 120 Neb. 684, 234 N.W. 628, 629 (1931); *Restatement (Second) of Torts, supra,* § 321; *see* Prosser, *The Law of Torts,* (4th ed. 1971), § 56 at 342–43.

In short, Delta knew of the poor condition of the recorder and had available the equipment to replace it; it knew of the production problems presented by a faulty recorder and of the reasonably foreseeable dangers posed to the public as a result of excessive plant emissions. Yet Delta failed to take adequate measures to prevent the recorder malfunction from happening; it did not mitigate the obvious hazards once the malfunction occurred; and it did nothing to warn the public of those hazards. The Court holds that Delta's negligence was also a proximate cause of the collision.[51]

### *Fault of BAR*

The FERNVIEW argues that BAR, as owner and operator of the pier, is responsible in part for the collision because it was derelict in its duties as a wharfinger. It is well settled that, although a wharfinger "does not guarantee the safety of vessels coming into [its] wharves," it is "bound to exercise reasonable diligence in ascertaining the condition of the berths thereat, and if there is any dangerous obstruction to remove it, or to give notice of its existence to vessels about to use the berths." *Smith v. Burnett,* 173 U.S. 430, 433, 19 S.Ct. 442, 443,

---

**50.** That Delta appreciated the hazards of operating with a malfunctioning 98% acid recorder is underscored by a memorandum from C. C. West, the Delta maintenance supervisor, to Hess dated June 13, 1974, two months before the incident at issue, which stated:

> This instrument [the 98% acid recorder] is necessary to make acid and hold the strength without fluctuation. Any sudden change in strength results in heavy absorber stack omissions [*sic*] that are visible to the surrounding area.

Delta clearly knew that a broken recorder was likely to cause excessive emissions.

**51.** In connection with its discussion of the faults of Delta, the Court notes an enlightening bit of doggerel penned in the Delta log book on November 15, 1974, which reads:

> Gas leaks—gas leaks everywhere
> Promises to fix them float in the air
> Time continues to pass us by
> While the fumes still head for the sky
> There is nothing there to West's eye
> Production—Production is Sawyer's cry
> As you sit gasping in your chair
> The "Dollar Sign" is everywhere.
> In the background OHSA [*sic*] lurks
> Waiting to foul up the works.

43 L.Ed. 756 (1899); *Paragon Oil Co. v. Republic Tankers, S. A.,* 310 F.2d 169, 173 (2d Cir. 1962), *cert. denied,* 372 U.S. 967, 83 S.Ct. 1092, 10 L.Ed.2d 130 (1963). The FERNVIEW claims that because BAR personnel knew, or should have known of the thick fog, and because neither Oden Gradie, the BAR agent in charge of the pier, nor any other BAR employee sought to warn the FERNVIEW of the fog, BAR breached the standard of care which it owed the ship.

The FERNVIEW's efforts to hold BAR responsible for the collision must fail. As a wharfinger, BAR was obligated to warn the ship of an unusual or latent dangerous condition obstructing the berth. *E. g., Smith v. Burnett, supra* (submerged rock underneath berth); *Paragon Oil Co. v. Republic Tankers, supra* (other vessel already in the berth); *Garfield and Proctor Coal Co. v. Rockland-Rockport Lime Co.,* 184 Mass. 60, 67 N.E. 863 (1903) (submerged ledge near dock). The wharfinger's duty to warn, however, applies only to "any hidden hazard or deficiency . . . not reasonably known to the shipowner." *Bunge Corp. v. M/V Furness Bridge, supra, citing Trade Banner Line, Inc. v. Caribbean Steamship Co., S.A.,* 521 F.2d 229, 230 (5th Cir. 1975). A wharfinger is under no duty to advise an approaching vessel of weather reports at the pier or of other conditions arising during the ordinary course of navigation or docking and which are readily apparent to the ship. *Bunge Corp. v. M/V Furness Bridge, supra* (wharfinger under no duty to warn ship of night fog); *United States Trucking Corp. v. City of New York,*

18 F.2d 775 (2d Cir. 1927) (wharfinger under no duty to warn vessel of visible wreck alongside pier); *Sabine Towing and Transportation Co. v. St. Joe Paper Co.,* 297 F.Supp. 748 (N.D.Fla.1968) (wharfinger under no duty to warn vessel of bolts protruding from dock where captain and pilot of ship had actual knowledge of the bolts and appreciated the hazard). The FERNVIEW has been unable to cite any authority for the proposition that a wharfinger must inform a ship of fog, winds, or similar meteorological phenomena. The mere presence of the fog did not constitute a latent dangerous condition about which BAR ought to have informed the vessel. The Court holds that the railroad cannot be faulted for its conduct.

### Fault of I.T.O.

The FERNVIEW attempts to place liability for the collision on I.T.O. on three separate grounds. First, the FERNVIEW claims that I.T.O. was a wharfinger and, as such, was charged with the duty of warning the ship about the reduced visibility near the dock. Even assuming *arguendo* I.T.O. to have been a wharfinger,[52] there exists no basis upon which to hold that I.T.O. breached the standard of care which a wharfinger owed the ship. *See Discussion, Fault of BAR, supra.*

The second theory which the FERNVIEW advances stems from Abbott's purported conversation with his wife concerning visibility conditions. During the trial, Abbott stated that as the FERNVIEW passed between Buoys # 5 and # 6, he

---

**52.** The FERNVIEW seeks to classify I.T.O. as a wharfinger on the basis of 35 M.R.S.A. § 15(27), which, for purposes of regulating public carriers, defines a wharfinger as

. . . every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any dock, wharf or structure used by vessels in connection with or to facilitate the receipt or discharge of freight or passengers for compensation within this State.

The FERNVIEW claims that because of its contract with BAR to handle cargo landed at the BAR pier, I.T.O. was a wharfinger within the statutory definition. The ship additionally con-

tends that, even if not strictly within the terms of the statute, I.T.O.'s activities on the pier rendered it a de facto wharfinger.

These arguments must fail. The primary element distinguishing a wharfinger from other users of a pier is the control over pier functions which the wharfinger assumes. *See, id.* The record in the instant case unquestionably establishes BAR as the wharfinger. BAR owned the pier, BAR watchmen patrolled it, and the BAR special agent, Oden Gradie, exercised ultimate control over the facility, subject to instruction from BAR management. I.T.O. merely unloaded dry cargo pursuant to a contract with BAR and was not the wharfinger.

spoke with his wife by radio and asked her to telephone Hartley Fraser, I.T.O.'s general manager, to inquire about weather conditions at the BAR pier. Accordingly to Abbott, his wife returned the call, stated that she had spoken with Fraser, who was at the I.T.O. office near the land end of the pier, and reported that Fraser had said he could see "the edge of the dock and beyond." Abbott interpreted this report to mean that Fraser could see beyond the southerly, or water end of the pier and that consequently visibility near the pier ranged from 600'–1000'. The FERNVIEW claims that under the Good Samaritan rule, e. g., *Indian Towing Co. v. United States*, 350 U.S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48 (1955), I.T.O., through Fraser, assumed the duty of exercising due care in reporting visibility to Mrs. Abbott, that Fraser violated this duty by not adequately ascertaining the true visibility conditions, and that in relying on Fraser's false report, the FERNVIEW proceeded to attempt to land, whereas if Fraser's report had been accurate, the ship would have stopped or would have taken other actions which would have avoided the collision.

 Although Mrs. Abbott's testimony substantially confirmed that of her husband, Fraser flatly denied having had any conversation with Mrs. Abbott on the morning of August 21 and stated that he did not arrive at the pier until approximately 0815, long after the accident.[53] In reviewing the various pieces of extrinsic evidence which bear on this sharply conflicting testimony, the Court is persuaded that it cannot accept the Abbotts' version of the event and rejects the contention that Abbott received a weather report from Fraser.

It should be noted initially that a phone call from Abbott to the I.T.O. office via his wife would have been unique. Abbott stated that he never previously had called I.T.O. from a ship for a weather report and, in fact, during his entire career as a Penobscot Bay pilot, had made only one other call to the BAR pier to confirm visibility conditions. On that occasion he spoke with the

BAR watchman and not the I.T.O. office. Abbott further admitted that the usual practice was for the pilots to call the C. H. Sprague Co. dock for a weather report, not the BAR pier. Also troubling is the manner in which the alleged conversation first was revealed. Abbott acknowledged that neither he nor his wife had discussed the incident until the summer of 1976, two years after the accident, in the course of a conference with his counsel and counsel for the ship. Abbott made no reference to the call in the report of the collision which he prepared on August 22, 1974, in his report to the investigating Coast Guard officer, or to the Penobscot Bay and River Pilotage Commission. For all of these reasons, the Court must disregard evidence of the phone call to Fraser; I.T.O. cannot be held liable because of the purported conversation.

 Moreover, even if the call had taken place, the FERNVIEW could not prevail on this theory of liability. Fraser's alleged remarks were ambiguous and very likely could have meant that it was possible to see the northerly, or land edge of the pier. The added comment "and beyond" makes more sense in the context of the latter interpretation. Without the remainder of the pier as a reference, in a period of restricted visibility, Fraser would have been unable to determine how far, if at all, he could see beyond the southerly end of the pier. Hence, Fraser's comment may have been wholly accurate; certainly, he had no motive to lie to Mrs. Abbott by exaggerating the visibility at the pier. A close examination of Abbott's version of the conversation also reveals that he relied on his wife's description of the sunny conditions at their home in Belfast no less than he did on Fraser's alleged report of visibility at the pier. Finally, even if Abbott did rely on the alleged report, that reliance ceased to be reasonable, at least ten minutes and possibly as long as 30 minutes later, as the FERNVIEW approached the pier and it became apparent that visibility was considerably less than 1000 feet. At 0729, when the

---

**53.** Fraser died before the trial; his testimony was admitted through his pretrial deposition.

FERNVIEW was approximately a ship's length from the pier, visibility unquestionably was less than what Fraser allegedly had reported and was deteriorating. Reliance on the alleged report at that point, when Abbott still could have stopped the ship before hitting the pier, would have been wholly unjustified. Accordingly, the FERNVIEW could not succeed on the basis of the alleged report had it occurred. *Cf. Hess, Inc. v. The Arizona*, 1957 AMC 499 (S.D.N.Y.1955), *aff'd*, 1957 AMC 505 (2d Cir. 1957).

The third ground upon which the FERNVIEW seeks to charge I.T.O. with liability—that the banging sounds made by the I.T.O. longshoremen at the end of the pier lured the vessel into a dangerous berth—is preposterous. The noises were intended to let the ship know the location of the pier and nothing more. In fact, the hammering had the desired effect, since the mate in the bow of the FERNVIEW heard the noises and reported them to the bridge immediately before issuing his ambiguous astern order. To label the hammering a lure which attracted the vessel to an unsafe berth defies both the facts and common sense. With good reason, the FERNVIEW can offer no authority to support this contention. The actions of the longshoremen afford no basis on which to hold I.T.O. responsible for the collision.

The Court holds that no fault of I.T.O. was a proximate cause of the collision.

### Apportionment of Fault Between the FERNVIEW and Delta

With its landmark decision in *United States v. Reliable Transfer, Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), the Supreme Court discarded the venerable rule of divided damages which formerly had applied in maritime collision cases when more than one party was at fault and, instead, adopted a standard of comparative fault. The Court held that

. . . when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.

*Id.* at 411, 95 S.Ct. at 1716. Accordingly, having found that the negligence both of the FERNVIEW, by her pilot and ship's officers, and of Delta, in producing the excess emissions, proximately caused the accident, the Court must apportion liability between these parties.

The Court initially notes that the instant matter is neither one in which the parties are equally at fault nor one in which it is not possible fairly to allocate fault between the ship and Delta. Rather, in allocating responsibility for the collision, it is clear that the greater part of the fault by far must rest on the FERNVIEW because of the operational negligence of her pilot and ship's officers. The acts and omissions of the pilot and ship's officers were multiple and serious. The failure to keep track of the FERNVIEW's position and speed, the failure to communicate adequately with the bow, the concern over a late arrival, the improper use of radar, and the failure either to stop the FERNVIEW or to reduce substantially her speed just prior to the collision collectively constitute fault of high order. The Court therefore concludes that most of the fault must be charged to the FERNVIEW.[54] *See Complaint of Flota Mercante Grancolombiana, S.A.*, 440 F.Supp. 704, 726 (S.D.N.Y.1977); *Linehan v. United States Lines, Inc.*, 417 F.Supp. 678, 695 (D.Del.1976), *modified*, 559 F.2d 1208 (3d Cir. 1977).

54. Because the ship and her owners have admitted that at all material times the pilot, captain and officers of the FERNVIEW were acting as their agents and servants, the Court need not distinguish among the various "FERN-VIEW interests" in its apportionment of liability; the FERNVIEW interests are considered as one entity for purposes of determining comparative fault among the parties.

By comparison, the fault of Delta is less serious than that of the ship. Delta's negligence contributed to a preexisting natural hazard. Although the FERNVIEW's pilot and ship's officers did not exercise that degree of prudent seamanship and due care demanded of them when they encountered the fog, the fact remains that Delta, through its various acts of negligence made more dense, and thus more hazardous, the natural fog. It was precisely the thickness and the complete blanketing effect of the fog which surprised the FERNVIEW's pilot and which made docking unusually difficult. Consequently, the Court concludes that a part of the fault must be assessed to Delta. *See Complaint of Flota Mercante Grancolombiana, S.A., supra; Linehan v. United States Lines, supra.*

Based on the entire record and the foregoing Findings of Fact, the Court finds that the collision was caused 80% by the fault of the FERNVIEW and 20% by the fault of Delta. Accordingly, the Court holds that 80% of the liability for the resulting damages must be allocated to the FERNVIEW and that Delta must bear 20% of the liability for such damages. *See United States v. Reliable Transfer, Inc., supra.*

## CONCLUSIONS OF LAW

The Court's Conclusions of Law are:

1. This Court has jurisdiction of the actions and of the parties thereto. 28 U.S.C. §§ 1333(1) and 1332(a)(2).

2. Both the negligent navigation of the FERNVIEW, by her pilot and ship's officers, and the negligence of Delta, in producing excessive chemical emissions which obscured visibility at the BAR pier, proximately caused the collision of the FERNVIEW with the BAR pier on the morning of August 21, 1974. Responsibility for the collision is attributable 80% to the fault of the FERNVIEW and 20% to the fault of Delta. *See United States v. Reliable Transfer, Inc., supra.*

3. The FERNVIEW, her owners and her pilot, and Delta are liable to BAR for its damages as joint tort-feasors. BAR is entitled to recover the full amount of its dam-

ages either from the FERNVIEW, her owners and her pilot, or from Delta. Delta is entitled to contribution in the amount of 80% of the damages from the FERNVIEW, her owners and her pilot, and the FERNVIEW, her owners and her pilot are entitled to contribution of 20% of the damages from Delta. *The Sterling,* 106 U.S. 647, 1 S.Ct. 89, 27 L.Ed. 98 (1882); *Empire Seafoods, Inc. v. Anderson,* 398 F.2d 204, 217 (5th Cir.), *cert. denied,* 393 U.S. 983, 89 S.Ct. 449, 21 L.Ed.2d 444 (1968); *Linehan v. United States Lines, Inc., supra.*

4. The acts or omissions of neither BAR nor I.T.O. constituted a proximate cause of the collision.

## DIRECTION FOR ENTRY OF JUDGMENT

In accordance with the foregoing Findings of Fact and Conclusions of Law, it is

ORDERED, ADJUDGED and DE-CREED:

(1) That in these consolidated actions an interlocutory judgment be entered in favor of Bangor & Aroostook Railroad Company against the FERNVIEW, her owners, Fearnlee & Eger, her pilot, William E. Abbott, and Delta Chemical, Inc. for the full amount of the damages sustained by BAR as a result of the collision of the FERNVIEW with the BAR pier on August 21, 1974; the FERNVIEW, her owners and her pilot shall be entitled to 20% contribution and Delta Chemical, Inc. shall be entitled to 80% contribution.

(2) That in these consolidated actions final judgment be entered dismissing all claims against I.T.O. Corp. of New England.